EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL ACTION NO. |
| | ) | |
| Plaintiff, | ) | 1:21-CR-117(TFH) |
| | ) | |
| v. | ) | |
| | ) | |
| Alex Kirk Harkrider, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT HARKRIDER'S MOTION TO TRANSFER VENUE AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

COMES NOW, Defendant, Alex Harkrider, (hereinafter "Harkrider") by

undersigned counsel, and respectfully moves the Court, pursuant to Federal Rule of

Criminal Procedure 21, for a transfer of venue so that he may be tried by an impartial jury

as guaranteed by the Fifth and Sixth Amendments to the United States Constitution.

### I.    PROCEDURAL HISTORY

This case arises out of the events at the United States Capitol on January 6,

2021(hereinafter "J6").  Defendant Harkrider was indicted on November 10, 2021 with an

eleven count superseding indictment charging him and his co-defendant, Ryan Nichols,

with violations of  18 U.S.C. Sections 231(a)(3), 2 (Civil Disorder), 18 U.S.C. Sections

1512(c)2 and 2 (Obstruction of an Official Proceeding),  18 U.S.C. Sections 111(a)(1) and

(b) (Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon), 18

U.S.C. Section 641 (Theft of Government Property), 18 U.S.C. Section 1752(a)(1) and

(b)(1)(A) (Entering and Remaining in a Restricted Building or Grounds with a Deadly or

Dangerous Weapon), 18 U.S.C. Section 1752(a)(2) and (b)(1)(A) (Disorderly and

Disruptive Conduct in a  Restricted Building or Grounds with  a Deadly or Dangerous

Weapon), 40 U.S.C. Section 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building), 40

U.S.C. Section 5104(e)(2)(F) (Act of Physical Violence in the Capitol Grounds or

Building) and 40 U.S.C. Section 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in

a Capitol Building).  *See* ECF No. 59.

## II.    <u>LEGAL ARGUMENT</u>

### A. <u>Federal Rule of Criminal Procedure 21(a)</u>

The Fifth and Sixth Amendment of the United States Constitution entitle criminal

defendants to a fair trial by an impartial jury. *See In re Murchison*, 349 U.S. 133, 136

(1955).  "The theory in our system of law is that conclusions to be reached in a case will

be induced only by evidence and argument in open court, and not by any outside

influence[.]"*Patterson v. Colorado*, 205 U.S. 454, 462 (1907).  Justice Hugo Black

observed that the American justice system "has always endeavored to prevent even the

probability of unfairness." *Id.*  Accordingly, Federal Rule of Criminal Procedure 21(a)

instructs that district courts "must transfer the proceeding if the court is satisfied that so

great a prejudice against the defendant exists in the transferring district that the defendant

cannot obtain a fair and impartial trial there."

In some cases, a potential jury pool can be determined to be irredeemably biased

when the alleged crime results in "effects on [a] community [that] are so profound and

pervasive that no detailed discussion of the [pretrial publicity and juror partiality] evidence

is necessary." *United States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla. 1996)

(summarily finding that a trial of Oklahoma City bombing suspects in federal court in

Oklahoma City (Western District of Oklahoma) would be constitutionally unfair)(*see also Murphy v. Fla.*, 421 U.S. 794, 802 (1975) ("Even these indicia of impartiality [during voir dire] might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory.").  "[W]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." *Sheppard v. Maxwell*, 384 U.S. 333, 362-363, 86 S. Ct. 1507, 1522, 16 L. Ed. 2d 600, 620, (1966).

When the threatened harm is prejudice to a fair trial, a number of alternatives less restrictive of expression may be available, which include:

> (a)change of trial venue to a place less exposed to intense publicity; (b) postponement of the trial to allow public attention to subside; (c) searching questioning of prospective jurors to screen out those with fixed opinions as to guilt or innocence; (d) the use of emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court(;) (e) sequestration of jurors (to) enhance the likelihood of dissipating the impact of pretrial publicity and emphasize the elements of the jurors' oaths.

*In re Halkin*, 598 F.2d 176, 195, (D.C. Cir. 1979) (*citing Nebraska Press Ass'n*, 427 U.S. at 563-64; s*ee also Sheppard,* 384 U.S. at 333).  In *Irving v. Dowd*, the Supreme Court stated:

> In the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord Coke, a juror must be as "indifferent as he stands unsworne." Co. Litt. 155b. His verdict must be based upon the evidence developed at the trial. Cf. Thompson v. City of Louisville, 362 U.S. 199. This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies.
> *Irvin v. Dowd,* 366 U.S. 717, 722 (1961); but see *Patton v. Yount*, 467 U.S. 1025,

10311032 (1984) (distinguishing *Irvin v. Dowd's* holding on the grounds that the second jury trial took place four years later after pretrial publicity had long subsided.)

The Court further recognized that the presumption of prejudice overrides juror declarations of impartiality during voir dire because such attestations may be insufficient

to protect a defendant's rights in particularly charged cases.  Where pervasive pretrial publicity has "inflamed passions in the host community" and "permeat[es] the trial setting [such] that a defendant cannot possibly receive an impartial trial," the district court must presume local prejudice and transfer the proceeding. *United States v. QuilesOlivo*, 684 F.3d 177, 182 (1st Cir. 2012); *Cf. Mu'Min v. Virginia*, 500 U.S. 415, 429-430 (1991) (*citing Patton*, *supra*, at 1035) ("Under the constitutional standard, on the other hand, 'the relevant question is not whether the community remembered the case, but whether the jurors had such fixed opinions that they could not judge impartially the guilt of the defendant.'").

When examining a Rule 21 motion to transfer venue, a court should consider (1) the size and characteristics of the community; (2) the nature and extent of pretrial publicity; (3) the proximity between the publicity and the trial; and (4) presumed prejudice. *Skilling v. U.S.*, 561 U.S. 358, 378-81 (2010).  In *Rideau v. Louisiana*, 373 U.S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963), the Supreme Court held that a murder defendant's due process rights were violated where pretrial publicity included an interview broadcast three times locally.  *Id*.  The Court in *Skilling* distinguished the facts before it from the "[i]mportant differences separate Skilling's prosecution from those in which we have presumed juror prejudice."  *Skilling v. United States*, 561 U.S. 358, 381-382, 130 S. Ct. 2896, 2915, 177 L.  Ed. 2d 619, 643, (2010).

A review of the *Skilling* factors makes apparent that the Court should transfer the Defendant's case from the District of Columbia.  Both the Fifth and Sixth Amendments secure the right to trial by an impartial jury. Const. amends. V, VI; *see also Skilling v. United States*, 561 U.S. 358, 378 (2010).The importance of an impartial jury is so fundamental to Due Process that, notwithstanding constitutional venue prescriptions, when prejudice

4

makes it such that a defendant cannot obtain a fair and impartial trial in the indicting

district, the district court *must* transfer the proceedings upon the defendant's motion. Fed.

R. Crim. P. 21(a); *see also Skilling*, 561 U.S. at 378. In some instances, the hostility of

the venue community is so severe that it gives rise to a presumption of juror prejudice.

*See Patton v. Yount*, 467 U.S. 1025, 1031 (1984) (distinguishing between presumed venire

bias and actual juror bias).

Where it attaches, the Court has further recognized that the presumption of

prejudice overrides juror declarations of impartiality during *voir dire* because such

attestations may be insufficient to protect a defendant's rights in particularly charged cases.

*Murphy v. Fla.*, 421 U.S. 794, 802 (1975) ("Even these indicia of impartiality might be

disregarded in a case where the general atmosphere in the community or courtroom is

sufficiently inflammatory."); *see also Irvin v. Dowd*, 366 U.S. 717, 728 (1961) ("No doubt

each juror was sincere when he said that he would be fair and impartial to petitioner, but

psychological impact requiring such a declaration before one's fellows is often its

father."). Indeed, on appeal of a denial of a motion for change

---

[1] Though not relevant to the instant motion, the Court identified a fourth factor for consideration upon appellate review, following trial in the contested venue: (4)whether the jury convicted the defendant on all counts or only on a subset of counts.The lack of uniformity in result after denial of a motion to transfer venue, the Courtobserved, indicates that the jury was impartial and capable of rendering a verdict on only the facts presented, rather than preconceived notions of guilty.

of venue, an appellate court need not even examine the *voir dire* record if it finds that

the presumption attached. *Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963) ("But we do not

hesitate to hold, without pausing to examine a particularized transcript of the *voir dire*

examination of the members of the jury, that due process of law in this case  required a

[transfer].").  Thus, under this precedent, *voir dire* is simply not a cure for significant and

substantiated Due Process concerns about the jury pool.

Mr. Harkrider respectfully submits that these concerns are pressing in this case.

Additionally, facts show that the District of Columbia jury pool is already tainted and with each

passing day and the media coverage of the January 6th  House Select Committee hearings, there

is no hope that Mr. Harkrider can obtain a fair and impartial jury in the District of Columbia.


### B. Size and Characteristics of the Community

The first *Skilling* factor to consider is the size of the population eligible for jury duty.

*Skilling*, 561 U.S. at 382 (comparing Houston's 4.5 million potential jury pool with a smaller

Louisiana parish with 150,000 residents).  The District of Columbia has less than 700,000 in

total population[1], but because of its more transient population, the potential jury pool is likely

much smaller than a comparable federal district.[2, 3]    Several January 6th Defendants, not

---

[1] This total is not broken down to those eligible for jury duty.

[2] See 2020 Census Data Shows DC's Population Growth Nearly Tripled Compared to Previous
Decade, DC.gov (Apr. 26, 2021) (DC population recorded by census as 689,545)
https://dc.gov/release/2020-census-data-shows-dcs-population-growth-
nearlyhttps://dc.gov/release/2020-census-data-shows-dcs-population-growth-nearly-tripled-
compared-previous-decadetripledcompared-previous-decade

[3] See US Census, Quick Facts - District of Columbia, https://www.census.gov/quickfacts/DC (last
visited March 28, 2022)

Harkrider, commissioned a Multi-District Survey.  *See* Exhibit A  "Multi-District Study".  This extensive survey was conducted in four regions: the District of Columbia, the Middle District of Florida (Ocala Division), the Eastern District of North Carolina, and the Eastern District of Virginia. (*Id*. at p.1, f.n. 2).   While the non-D.C. test areas registered reliably similar results to each other, the survey found that D.C. respondents were an outlier and had a "decidedly negative" attitude towards J6 defendants.  (*Id*. at 2).    Shockingly, "*91% of DC Community respondents who answered all of the prejudgment test questions admit making at least one prejudicial prejudgment on issues related to the case, while other [areas] admit doing so at rates from 49% to 63%.*"  *Id*.  A whopping 30% of D.C. residents admitted to making every prejudicial prejudgment, double the rate of the next highest area.  *Id*.



A significant finding in the survey was the elevated concern by D.C. residents vis-a-vis their safety concerns in light of J6.   Respondents were asked: Have you experienced increased concern about your own safety or the safety of people important to you due to the events of January 6th?  The difference between the D.C. and the other areas is astounding:



The survey included four questions as to the personal impact J6 had on the respondents; the responses confirming personal impact on D.C. residents was almost double that of those surveyed in the Eastern District of Virginia.  *See* Ex. A at 4.

As the Court undoubtedly recalls, the National Guard was deployed in D.C. for more than four months after the J6.  Mayor Bowser declared a state of emergency and implemented a 6 p.m. curfew for weeks subsequent to J6.  The District

implemented significant road and public space closures in direct response to J6.[4] The

Department of Homeland Security declared that government offices were potential

targets of violent domestic extremists who were allegedly emboldened by the "mob

assault" on the Capitol.[5] Additionally, nearly 15,000 individuals work for Congress

directly, and many more D.C. residents have friends and family who work on the Hill.

Finally, many D.C. residents have friends and family employed by law enforcement

groups who took part in responding to J6. The majority of potential jurors in the

District of Columbia were personally impacted in some way by the events on Capitol

Hill on J6. *See* Ex. A at 4. This factor weighs heavily in favor of transferring the

instant cases to the Eastern District of Virginia or some other District. D.C. is a city

that, as a whole, feels that it has been the victim of a crime because of the events of

J6. J6 was a substantially more impactful event than Enron's collapse, which

personally affected a few hundred families in city of 4.5 million residents, who could

easily be stricken from the jury pool.


### C. Nature and Extent of Pretrial Publicity

The next *Skilling* factor pertained to the adverse publicity against the former

Enron executive. *Skilling*, 561 U.S. at 382 ("Second, although news stories about

_____

[4] DC Inauguration Updates: 4 Bridges Between DC, Virginia Closing; National Mall Closed; NBC4 Washington, https://www.nbcwashington.com/news/local/dc-inauguration-updates-fridayclosuresthreatsnational-mall/2542719/ (last visited March 28, 2022).
[5] *DHS Warns of Heightened Threats from Violent Domestic Extremists,* NPR, https://www.npr.org/2021/01/28/961470061/dhs-warns-of-heightened-threats-from-violent domestic- extremists (last visited March 28, 2022).

Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight.).  The nature and extent of pretrial publicity related to the events of J6 weigh heavily in favor of transferring venue.  District residents have been exposed to thousands of comments from local and national leaders regarding J6, related arrests, criminal charges, Congressional hearings and, prosecutorial outcomes.   Unlike the Enron prosecution, J6 is an ongoing event, with prosecutors still continuing to charge defendants.  The negative publicity loop never stops, whereas in *Skilling*, four years went by before the trial took place, with little negative publicity.

Negative press coverage is guaranteed to continue perhaps forever.

The January 6 Select Committee has released a number of public statements about alleged "insurrectionists," "white supremacists," and "domestic terrorists."[6] Speaker Pelosi went so far as to declare that Donald Trump was an accessory to murder.[7] *See* Section 3 below for additional citations.  Respectfully, Harkrider does not agree that J6 was an "act of domestic terror," "a white supremacist attack," or an "insurrection"  on his part. In fact, unlike D.C. residents, most Americans, as the three attached surveys show, believe that J6 was a very large protest that got out of hand and turned into a riot by a select few that were there.  One of the Capitol policeman,

---

[6] *See* Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol (July 21, 2021), https://perma.cc/B86B-SJTA (Pelosi Press Release)(emphasis added).

[7] *Nancy Pelosi on the Capitol Hill insurrection: Trump was an accessory to the crime of murde*r, MSNBC.com (2021), https://www.msnbc.com/msnbc/watch/nancy-pelosi-on-thecapitol http://www.msnbc.com/msnbc/watch/nancy-pelosi-on-thecapitol-hill-insurrection-
hillinsurrection- trump-was-an-accessory-to-the-crime-of-murder-99705925960 (last visited March 28, 2022).

Aquilino Gonell, wrote a guest essay in the New York Times on July 11, 2022, describing how President Trump and his followers beat him on January 6 as he defended "our democracy." He was then highlighted in the J6 hearing July 12, 2022 by Jamie Raskin. This type of inflammatory press will only continue to have unknown adverse effects on defendants like Mr. Harkrider. https://www.nytimes.com/2022/07/10/opinion/capitol-police-jan-6.html.

The Multi-District Study asked respondents four questions related to news coverage in the tested areas. The survey revealed that D.C. is an outlier when it comes to saturation coverage. Only 4.83% percent of DC respondents said "never or almost never" in regard to following news coverage, compared to 13.40% said in the Eastern District of Virginia. (Ex. A, fig. 6). D.C. residents have been inundated with one-sided coverage of the events surrounding J6, are surrounded by residents who feel personally impacted by J6, and clearly have been jaundiced towards the Defendants. The survey demonstrates that far fewer potential jurors outside the beltway are taking a personal interest in J6 as compared to their D.C. counterparts many of whom, according to the study, are closely following J6 coverage.

### D.    Proximity of Publicity to Trial

The *Skilling* Court distinguished *Rideau*, where a trial was conducted in close proximity to prejudicial news coverage, with Skilling's trial, where "over four years elapsed between Enron's bankruptcy and Skilling's trial." *Skilling*, 561 U.S. at 383. Again, this factor weighs heavily in favor of relocating the trial from D.C. The ongoing negative publicity generated by the House Select Committee Hearings creates presumed prejudice for defendant Harkrider and it is ongoing. The committee has not announced

11

when it will end its fact finding mission. In fact, Harkrider respectfully submits that

requiring him to go to trial in the District in the dark shadow of the Select Committee's

investigation, would be highly prejudicial. The Court of Appeals for the First Circuit,

for example, addressed the prejudicial effect of contemporaneous congressional

hearings in *Delaney v. United States*, 199 F.2d 107 (1st Cir. 1952). In *Delaney*, the trial

judge refused to grant a lengthy defense continuance request, which was based upon

ongoing congressional hearings into the "scandal" involving the defendant. *Id.* at 114.

The *Delaney* Court ruled that the trial judge abused his discretion in not granting the

continuance, noting that the actions of Congress in generating adverse publicity were

equivalent to prosecutors doing the same:

> [I]n being brought to trial in the hostile atmosphere engendered by all this
> pre-trial publicity, would obviously be as great, whether such publicity
> were generated by the prosecuting officials or by a congressional
> committee hearing. In either case he would be put under a heavy handicap
> in establishing his innocence at the impending trial. Hence, so far as our
> present problem is concerned, we perceive no difference between
> prejudicial publicity instigated by the United States through its executive
> arm and prejudicial publicity instigated by the United States through its
> legislative arm.

*Id.* at 114.

The Court of Appeals for the District of Columbia dealt with a similar issue

during Watergate. Former Nixon official Robert Ehrlichman sought a continuance of

his trial date based upon the Senate Watergate hearings, which was denied by the trial

judge. Upholding the trial court's ruling, the Court of Appeals distinguished *Delaney* on

the grounds that Ehrlichman was not indicted at the time of the Senate hearings, because

it was a full year in the rear-view mirror:

> Similarly, a continuance in the circumstances at bar is not required by *Delaney v. United* States, 199 F.2d 107 (1st Cir. 1952), where legislative hearings were held concerning the criminal activity to be tried. In this case, unlike *Delaney*, the Senate Watergate hearings occurred almost a year before the trial commenced and the defendants were not under indictment at the time of the hearings.

*United States v. Ehrlichman*, 546 F.2d 910, 916, n. 8 (D.C. Cir. 1976).

The non-stop negative publicity requires the Court to either grant a lengthy continuance or transfer of venue to a federal district that is not satiated by the Select Committee's work. The instant case is far worse than *Delaney* and *Ehrlichman*. On top of the Select Committee hearings, J6 is reported on every day in local news channels and in newspapers online and in print. The one-year anniversary of the event, as well as recent sentencings of high-profile J6 defendants, have kept the matter in the forefront of local discourse and no doubt the 2nd anniversary will be much the same. And on and on each year. Indeed, with former President Trump suggesting he may run again for President, the impact of these hearings, and the political fallout, cannot be underestimated. There are daily stories about the congressional investigation into the events of J6, revealing new details, with a political spin and a decidedly one-sided taint. Multiple Trump Administration officials have refused to testify before the Select Committee for various reasons, creating an aura of suspicion in the minds of potential D.C. jurors that they may be hiding incriminating information.

Most recently, Ms. Cassidy Hutchinson testified before the select committee and ratings were through the roof. https://www.huffpost.com/entry/cassidy-hutchinson-television-ratings-gold-jan-6-donald-trump_n_62c9efc5e4b0aa392d3f95e6

D.C. came to a screeching halt as everyone tuned in to her testimony before the J6

committee. The fallout of this hearing has caused even more witnesses to be

subpoenaed.  From June 28, 2022 to July 9, 2022, The Washington Post ran at least 31

pieces, both news and opinion, on Ms. Hutchinson's testimony and its aftermath.  The

headlines continued to sensationalize the story calling her testimony a "smoking gun"

and "explosive" and hyping her as the aide who shattered the White House's "code of

silence." https://www.washingtonpost.com/opinions/2022/06/28/cassidy-hutchinson-

breaks-trump-white-house-code-of-silence/.  The sensationalized and hyped prime-time

and day time hearings have only added to the publicity and prejudice the J6 defendant's

like have continued to experience.  According to news sources, Ms. Hutchison's

testimony reached the largest live audience of the daytime J6 hearings.

https://news.yahoo.com/cassidy-hutchinson-testimony-set-audience-

225925410.html?fr=sycsrp_catchall The Committee's billing of it as a "surprise

hearing" shrouded in secrecy, no doubt played a huge role in those ratings.

https://theweek.com/jan-6-committee/1014742/cassidy-hutchinsons-bombshell-

testimony.  This was despite the fact that Ms. Hutchinson sat for four videotaped

interviews with the select committee previously, including one earlier in the month of

June. https://www.politico.com/news/2022/06/29/jan-6-hutchinson-secret-service-

00043164

On January 7, 2021 Rep. Bennie Thompson (D-MS), now the Chairman of the

Select Committee to Investigate the J6, stated in an official statement, that

> [w]hat occurred yesterday at our nation's Capitol was – pure and simple
> – domestic terrorism incited by President Trump, his enablers, and those
> seeking to overturn the results of a legitimate election. January 6, 2021

will go down in history as the date that an angry mob of domestic
terrorists and insurrectionists illegally tried to prevent our elected
representatives from fulfilling their constitutional duty in the orderly
transfer of power. It was a sad day for our democracy[.][8]

On July 21, 2021 Speaker Pelosi released her statement on Republican
recommendations to serve on the House Select Committee to Investigate the January 6th
Attack on the United States Capitol.[9]  In the Speaker's statement, without any due
process beforehand, she pronounced definitively that "January 6th [was an]
"Insurrection" and authorized the Select Committee to "investigate and report upon the
facts and causes of the *terrorist mob attack."*  The Select Committee has also provided
information it obtained through its contemporaneous investigation on an individual
named Ray Epps, before the Department of Justice made any specific production to any
defendants.[10]  On April 8, 2022 it was reported that:

> The House Select Committee Investigating the violent breach of the U.S.
> Capitol building on January 6, 2021, has reportedly uncovered evidence
> that   shows that there was coordination between two white supremacist
> militias during that event — and that those militias may have also

---

[8] *The Hon. Bennie Thompson's Official Statement:*
https://homeland.house.gov/news/pressreleases/chairman-thompson-statement-on-domestic-
terroristhttps://homeland.house.gov/news/press-releases/chairman-thompson-statement-on-domestic-terrorist-
attack-on-capitolattack-on-capitol

[9] *See* Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on Republican
Recommendations to Serve on the Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol (July
21, 2021), https://perma.cc/B86B-SJTA (Pelosi Press Release)(emphasis added).

[10] After senators brought Epps up in a hearing, a Jan. 6 committee spokesperson released a statement last
week, saying Epps "informed us that he was not employed by, working with, or acting at the direction of
any law enforcement agency on January 5th or 6th or at any other time and that he has never been an
informant for the FBI or any other law enforcement agency."  Select committee member Rep. Adam
Kinzinger, an Illinois Republican, said that Epps "didn't enter the Capitol on Jan. 6 and was removed
from the most wanted list because, apparently, he broke no laws."

coordinated with organizers of the "Stop the Steal" rally that proceeded the attack on Congress.[11]

And the *New York Times* has reported that "[t]he House committee investigating the Jan. 6 attack on the Capitol said on Wednesday that there was enough evidence to conclude that former President Donald J. Trump and some of his allies might have conspired to commit fraud and obstruction by misleading Americans about the outcome of the 2020 election and attempting to overturn the result." [12] The Select Committee's one-sided perspective on the events of J6 has caused significant prejudice for the Defendant and these statements, released before a full investigation has been concluded demonstrate the political nature of the investigation rather than a true attempt to seek truth for the American people.

Likewise, multiple statements made by Attorney General Merrick Garland have tainted the District of Columbia's jury pool. General Garland, for instance, has repeatedly compared J6 to the Oklahoma City bombing case, alleging at his confirmation hearing that "there was a line that connected the January insurrection to the Oklahoma City bombing and back to the battles of the original Justice Department against the Ku Klux Klan."[13] In a June speech to DOJ officials, the Attorney General

---

[11] Report: Jan. 6 Committee Finds Connections Between Militias & Rally Organizers By Chris Walker, TruthOUT.com April 8, 2022 https://truthout.org/articles/report-jan-6-committeehttps://truthout.org/articles/report-jan-6-committee-finds-connections-between-militias-rally-organizers/findsconnections-between-militias-rally-organizers/ (emphasis added).

[12] *Jan. 6 Committee Lays Out Potential Criminal Charges Against Trump* By Luke Broadwater and Alan Feuer, New York Times, March 2, 2022, https://www.nytimes.com/2022/03/02/us/politics/trump-criminal-charges-jan-6.html

[13] Zoe Tillman, *Merrick Garland pledged to investigate the Capitol insurrection*, Buzzfeed (Jun. 15, 2021), https://www.buzzfeednews.com/article/zoetillman/merrick-garlandinvestigate-capitol-riotshttps://www.buzzfeednews.com/article/zoetillman/merrick-garland-investigate-capitol-riots-attorney-

"compared the 1995 Oklahoma City bombing to the Capitol riot of January 6 when

unveiling the Justice Department's response to the Biden Administration's new anti-

domestic terrorism strategy."[14]  The Attorney General's repeated comparisons of the

Oklahoma City bombing to J6 is particularly relevant to this motion as the Attorney

General, a senior DOJ official at the time, supervised the prosecution of Timothy

McVeigh and his co-conspirators.[15]  During his prosecutorial leadership, Garland

agreed with defense attorneys that the Eastern District of Oklahoma could not provide

the Oklahoma City defendants a fair trial, and consented to a transfer of venue.  *United*

*States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla 1996) ("There is no

disagreement among the parties with Judge Alley's concern about a trial in Oklahoma

City. The effects of the explosion on that community are so profound and pervasive that

no detailed discussion of the evidence is necessary.").[16]  *A priori*, if the events of J6 are

comparable to the Oklahoma City case in the opinion of the Attorney General, who in

---

generalattorney-general.  See also (AG Garland speech on combatting domestic terrorism) (Jun. 15, 2021),
https://www.youtube.com/watch?v=6-_lolzn5Bo (Jun. 15, 2021).
[14] Jerry Dunleavy, *Merrick Garland ties Oklahoma City bombing to Capitol Riot*, Wash. Examiner (Jun.
15, 2021), https://www.washingtonexaminer.com/news/garland-oklahomacity-bombing-capitol-riot.
[15] Wash. Post (Feb. 21, 2021) (video of testimony of AG confirmation hearing),
https://www.washingtonpost.com/video/politics/garland-we-are-facing-a-more-
dangerousperiodhttps://www.washingtonpost.com/video/politics/garland-we-are-facing-a-more-dangerous-period-
than-we-faced-in-oklahoma-city-at-that-time/2021/02/22/ceebcd88-5d4c-4c01-b07e-
6b937d75b3d8_video.htmlthan-we-faced-in-oklahoma-city-at-that-time/2021/02/22/ceebcd88-5d4c-4c01b07e-
6b937d75b3d8_video.html.  See also Dana Milbank, *Merrick Garland lets domestic terrorists know there's a
new sheriff in town*, Wash. Post (Feb. 22, 2021) ("Garland . . . prosecuted the Oklahoma City bombing
perpetrators before becoming a federal judge[.]").
[16] The Government's suggestion that McVeigh prosecutors agreed to transfer the case from Oklahoma City
because the "federal courthouse was itself damaged during the bombing" is not accurate.  The McVeigh
court clearly indicated that the Government agreed that McVeigh's ability to receive a fair trial in
Oklahoma City was "chancy."  McVeigh, 918 F. Supp. at 1470.

1995 agreed to a transfer of venue in the latter case, logically a comparable transfer of venue in the instant case would comport with consistent treatment of defendants.

### E. Presumed Prejudice

In *Skilling*, the Supreme Court explained presumed prejudice, and explained why it was lacking in that case.

> Finally, and of prime significance, Skilling's jury acquitted him of nine insider trading counts. Similarly, earlier instituted Enron-related prosecutions yielded no overwhelming victory for the Government. It would be odd for an appellate court to presume prejudice in a case in which jurors' actions run counter to that presumption.

*Skilling*, 561 U.S. at 383.

Unlike the defendants in *Skilling*, to date, all of the J6 trials before juries have resulted in unanimous jury verdicts promptly returned against the defendant: The first trial summary, according to the *N.Y. Post*: "[T]he first jury trial for a Capitol protestor from January 6, 2021 led to Guy Reffitt, a 49-year-old member of the "Texas Three Percenters" militia group, was found guilty on all five of the felony charges he faced, including bringing a gun onto the Capitol grounds and obstructing an official proceeding. A federal jury in Washington, DC, handed down the unanimous verdict against Reffitt after just two hours of deliberation." *See* "Guy Reffitt found guilty in first Capitol riot trial, By Emily Crane and Jorge Fitz-Gibbon, New York Post, March 8, 2022," https://nypost.com/2022/03/08/guy-reffitt-found-guilty-in-first-capitolriot-trial.

On April 14, 2022, "[a]fter less than three hours of deliberations, a Washington, D.C., jury found Dustin Thompson guilty of multiple charges stemming from his participation in the January 6, 2021, Capitol assault, including obstructing Congress'

18

certification of the Electoral College votes and stealing liquor and a coat rack from the Capitol building.  He likely faces a maximum sentence of 20 years in prison." *See* Ohio man who argued he was "directed" by Trump to join the Jan. 6 Capitol riot convicted on all counts,  CBSNews, By Robert Legare, April 14, 2022 Ohio man who argued he was "directed" by Trump to join the Jan. 6 Capitol riot convicted on all counts - CBS News.

Every other case that's gone to trial has resulted in a guilty verdict. *See  U.S. v. Cusanelli.* 21 CR 37(TNM)*;  U.S. v. Robertson,*  21 CR 34 (CRC);   *U.S. v. Griffin,* 21 CR 92(TNM); *and U.S. v. Williams,* 21 CR 377 (BAH). Steven Bannon goes on trial today. Same sensationalism.

a. **The Multi-District Study**

The Multi-District Study found that while the tested areas differ from each other in geographic location, demographic composition and political party alignment, the non-D.C. areas produced reliably similar results to each other on most questions in the survey, with the D.C. standing apart.   *See* Ex. A at 2..  Notably, the Eastern District of Virginia is consistently more in line with North Carolina and Florida than the District:

> "Q3. 72% of DC Community respondents said that they are likely to find Defendants guilty – even when given the choice, "It is too early to decide." The median in the Study was 48%.
>
> • Q5. 85% of the DC Community characterizes the Events of January 6th as acts that are criminal in nature (insurrection, attack or riot), even when given options to reserve judgment on that question. The median in the Study was 54%.
>
> • Q6. 71% of the DC Community believes that all who entered the U.S. Capitol without authorization planned in advance to do so, even when offered options to reserve judgment on that question. The median in the Study was 49%.
>
> • Q9. Over 40% of the DC Community stated they believe all the Events of January 6th were racially motivated, even when offered

options to reserve judgment on that question. (Emphasis added) The median in the Study was 20%.

Also noteworthy are the results on preconceived beliefs that the J6 defendants preplanned to go into the Capitol:



(Edh. A, fig. 1).  Well over the majority, 71% of D.C. residents believe that J6 was preplanned, whereas discovery has produced no evidence that the Defendant planned the Capitol breach or even planned to march to the Capitol that day.  This result is significant on the issue of intent, which is an essential element of a number of the charges.   The Defendant would face a jury in the District of Columbia that overwhelming doubts his major defense, i.e., that there was no preplanning of J6.

The Multi-District survey also confirms substantial bias in D.C.'s potential jury pool:



(Exh. A, fig. 2).  Again, this survey shows the significant percentage with which the District of

Columbia surpasses the three other jurisdictions by well beyond the margin of error:

> This bias is not only more prevalent in the DC Community, but it is also
> more intense. The DC Community also admits making more than one
> prejudicial prejudgment at a much higher rate than respondents from the
> other Test Areas. In fact, 30% of DC Community respondents admit that
> they have already made every prejudicial prejudgment tested for in the
> survey – double the rate of the next highest Test Area.

(Ex. A at p. 2).

### b. Analysis by the Federal Public Defenders' Office:

> Significant majorities of potential jurors in DC have prejudged the January 6
> defendants.

The D.C. Federal Defender's Office (the "PD Survey") commissioned a survey of

potential jurors.  The PD Survey shows that a significant percentage of D.C.'s potential

jurors harbor negative attitudes of J6 defendants and have already concluded that they

are guilty.  (Case No. 1:21-cr00024-EGS, ECF 101-1, Select Litigation Report

commissioned for the PD, D.C., with appendices), and hereby incorporated for these Defendants.   Attached hereto as Exhibit  B.

The PD Survey polled 400 potential D.C. jurors, and 400 potential jurors in the Atlanta Division of the Northern District of Georgia, similar in a few factors to the District of Columbia.  The firm also retained the services of a media research firm, News Exposure, to analyze aspects of news coverage concerning January 6.   *See* Ex. B. The PD Survey found that most District of Columbia residents prejudged the defendants as generally "guilty" and prejudged the element essential to intent. *Id.* at  ¶¶14, 10, 15, 18).   Significant majorities in the District would characterize J6 protestors as "criminals" (62%) and have already formed the opinion that these individuals are people are "guilty" of the charges brought against them (71%).  *Id.* at ¶¶ 14, 10. Typically, one would expect most respondents to reserve judgement on guilt or innocence.  Yet over half of the District's survey respondents were willing to admit that they are more likely to vote "guilty" if they find themselves on a jury in a J6 case (52%).  *Id.*  at ¶ 1.  And potential D.C. jurors (85%) believe that J6 protestors were "insurrectionists" (72%) and entered the Capitol to try "to overturn the election and keep Donald Trump in power."  *Id.* at ¶ 15, 18.  Those surveyed have prejudged these key elements of the Defendant's central defenses.  In the PD Survey, in reviewing the same questions asked of 400 prospective jurors in the Atlanta Division of the Northern District of Georgia, significantly fewer potential jurors have the bias against January 6th defendants when compared to the District of Columbia. *Id.* at ¶ 19-23.

**c. <u>Analysis by Zogby Polling Co.</u>**

One J6 Defendant, Garcia, filed a Motion to Transfer Venue and attached a Survey for

the District of Columbia by Zogby, Inc., a well-regarded polling company.  Case 1:21-

cr00129-ABJ, ECF 54-1 Filed 02/01/22, attached hereto as Exhibit C.   This survey polled

400 D.C. residents in January of 2022.  The Zogby poll and *Garcia* filing is hereby

incorporated into this filing.  The Zogby poll found that:

> --88% of registered D.C. voters believe that if Garcia went inside the Capitol building on January 6, 2021, he should be convicted of obstruction of justice and civil disorder;
>   --73% of respondents believed that anyone who merely entered the Capitol building on J6 is guilty of insurrection;
> --A majority (64%) of respondents believe that anyone who entered the Capitol building on J6 is responsible for other protestors' violence and destruction of property;
> --70% of respondents believe that anyone who went inside the Capitol building on January 6 was trying to stop the certification of the electoral vote for president.

The findings on the Multi-District Study show results that are in line with both

the PD and Zogby surveys showing evidence of prejudgment bias as to overall guilt and

on the element of intent, even when compared with the closest neighboring jurisdiction,

the Eastern District of Virginia.

In *Skilling*, Justice Sotomayor, J. wrote,

> I respectfully dissent, however, from the Court's conclusion that Jeffrey Skilling received a fair trial before an impartial jury. Under our relevant precedents, the more intense the public's antipathy toward a defendant, the more careful a court must be to prevent that sentiment from tainting the jury. In this case, passions ran extremely high. The sudden collapse of Enron directly affected thousands of people in the Houston area and shocked the entire community. The accompanying barrage of local media coverage was massive in volume and often caustic in tone. As Enron's onetime chief executive officer (CEO, Skilling was at the center of the storm. Even if these extraordinary circumstances did not constitutionally compel a change of

23

venue, they required the District Court to conduct a thorough voir dire in
which prospective jurors' attitudes about the case were closely scrutinized.
The District Court's inquiry lacked the necessary thoroughness and left
serious doubts about whether the jury empaneled to decide Skilling's case was
capable of rendering an impartial decision based solely on the evidence
presented in the courtroom. Accordingly, I would grant Skilling relief on his
fair-trial claim.

*Skilling*, 561 U.S. at 427.  (Justice Sotomayor, J. concurring in part and
dissenting in part).

### d. <u>Alternate Venues</u>

Venue transfer is proper under Rule 21(b) for convenience. Federal Rule of Criminal

Procedure 21(b), which allows for venue transfer "for convenience," provides that,

"[u]pon the defendant's motion, the court may transfer the proceeding, or one or more

counts, against the defendant to another district for the convenience of the parties, any

victim, and the witnesses, and in the interest of justice." When enacted, "the draftsmen

of Rule 21(b) sought a provision that would ensure some degree of equality between

prosecution and defense in choice of forum." Assessment on Transfer Motion of Jury

Bias in Transferee District Held Abuse of Discretion Remediable by Mandamus, 63

COLUM. L.REV. 1324,

Harkrider cannot obtain a trial by an impartial jury in the District of Columbia

because seating an impartial jury is impossible under the current tainted environment

given the unique qualities of the DC jury pool.  Defendant Harkrider submits that the

Eastern District of Virginia or some other District, specifically the Northern or Eastern

Districts of Texas, would be appropriate alternative venues.  The Eastern District of

Virginia in Alexandria is just over 8 miles away from the federal courthouse in D.C.

Although a short distance from the District of Columbia, the Eastern District of Virginia

offers potential jurors shown by sound studies to be significantly less biased.  This change of venue would result in very little inconvenience for the Court and the parties and would actually be a more convenient (and safer) location for many other participants in the trial.  Moreover, the Court would avoid the very distinct risk of having to potentially try the instant cases twice, as multiple surveys provide documented proof that substantial prejudice exists in D.C.'s jury pool, and case law suggests that a highly publicized congressional inquiry generating negative headlines against the J6 participants *during their trial* could be grounds for a mistrial or a new trial on appeal. This Court even stated in the last status conference that it would consider postponing the trial based solely on the J6 committee hearings.

Alternatively, The Eastern or Northern Districts of Texas offer a venue choice that would bring some sense of equality between the prosecution and the defense in choice of forum.  Defendant Harkrider lives in Longview, Texas a city in the Eastern District of Texas and the AUSA in charge of this case is located in the Northern District of Texas.   Additionally, the paralegal helping Mr. Harkrider in his case has moved to Texas and resides in the Eastern District of Texas and could provide housing for undersigned counsel during trial at no cost.  Defendant recognizes that many of the witnesses for this case will reside in or near the District of Columbia, but with modern technology, many could testify remotely if the trial were held elsewhere.  Additionally, almost all of Mr. Harkrider's  (and the co-defendant's) witnesses and his family support system reside in Texas and a trial in Texas would be much for convenient for these witnesses and his family. *See United States v. Radley*, 558 F. Supp. 2d 865, 877 (N.D.

Ill. 2008) (finding transfer appropriate in part because it would be more convenient for defendants and their families); *United States v. Aronoff*, 463 F. Supp. 454 (S.D.N.Y. 1978) (granting transfer in part because denying it would deny the defendant support from his family and friends); cf. *United States v. Stanko*, 528 F.3d 581, 586 (8th Cir. 2008) (noting that, when weighing the convenience to the defendant of a Rule 18 intra-district transfer, the Court should also consider the ability of family, friends, and other supporters to attend the trial, and holding that defendant was prejudiced by "trial approximately 200 miles further than the nearest location permitted for such a trial"). Thus, this factor favors trial in the Northern or Eastern District of Texas.

Under similar circumstances, district courts have heavily weighed the expense imposed upon indigent defendants in favor of a transfer, noting that transfer is appropriate where the defendant cannot afford to travel to a different district and remain there during there during trial. *United States v. Hanley*, No. 94 CRIM. 394 (DAB), 1995 WL 60019, at *3 (S.D.N.Y. Feb. 10, 1995); see also *United States v. Radley*, 558 F. Supp. 2d at 882 (while recognizing the expense to the government of transporting witnesses to an alternative forum, "[o]n the whole, the Court finds this factor supports transfer because defendants do not have the same resources to support an extended trial in Chicago"); *United States v. Ferguson*, 432 F. Supp. 2d 559, 567 (E.D. Va. 2006) (rejecting government argument that transfer would be expensive, and finding that expense to defendants' weighed in favor of transfer to their home district, because "the United States of America has, for all practical purposes, unlimited financial resources to

bring to bear. Unlike the [defendants], the Government can, and does, mint money."). Therefore, this factor strongly supports a transfer to a venue closer to Defendant's home.

While pretrial publicity of the Capitol riot exists in other areas of the country, the personal impact J6 had on District residents and their families requires a transfer. The District of Columbia is further shown to have over 66% as personally impacted by a "fear of personal safety." The District of Columbia's jury pool is saturated with prejudice. Moreover, the notion that more than 4 out of 10 jurors would assume that J6 was "racially motivated" is disturbing and incorrect. The J6 Defendants should not have to prove that they are not racists, but this evidence clearly shows that's what they would have to do. And the work of the Select Committee is a daily dose of additional media coverage that cannot be unseen by the potential jurors in the District of Columbia.

### III.    CONCLUSION

Based on the foregoing, Defendant Harkrider has demonstrated that he faces significant, irreversible prejudice in the District of Columbia and will be unable to have a fair and impartial jury as guaranteed by the Fifth and Sixth Amendments to the United States Constitution. Accordingly, Mr. Harkrider requests that this Court transfer the venue to the Eastern District of Virginia or some other District, preferably the Northern or Eastern District of Texas, pursuant to Fed. R.Crim.Pl. 21(a).


KIRA ANNE WEST

By:    _____ /s/
       Kira Anne West
       DC Bar No. 993523
       27

712  H Street N.E., Unit  509
Washington, D.C.  20002
Phone:   202-236-2042
kiraannewest@gmail.com
Attorney for Mr.  Alex Harkrider

## **CERTIFICATE OF SERVICE**

I hereby certify on the 18th day of July, 2022, a copy of same was delivered to

the parties of record, by ECF pursuant to the Covid standing order and the rules of the

Clerk of Court.

_____/s/_____

Kira Anne West

EXHIBIT A



## Overview

In Lux Research ("ILR") was engaged by Law Offices of Juli Haller, which represents Connie Meggs, and by Fischer & Putzi, P.A, which represents Thomas Edward Caldwell, to investigate whether the qualified jury pool for the United States District Court for the District of Columbia ("DC Community") harbors bias prejudicial to defendants, such as Meggs and Caldwell, who are facing criminal prosecution related to incidents at the U.S. Capitol in Washington, D.C., on January 6, 2021[1] ("Defendants"). ILR was asked to design and conduct a study that would meet the following objectives:

1. Identify any specific themes of bias.

2. Gauge the intensity of any prejudicial bias detected.

3. Determine whether the rates and intensity of any prejudicial bias discovered within the DC Community are unique to the DC Community.

4. Ascertain whether respondents who indicate harboring bias against Defendants report doubt in their ability to be fair and impartial jurors for Defendants.

To achieve these objectives, ILR impartially conducted a well-conceived community attitude survey ("CAS") of the DC Community and, concurrently, of the qualified jury pools in three additional federal districts ("Test Areas.")[2]. Over 1500 potential jurors were interviewed, yielding over 350 responses from each Test Area. Respondents were randomly selected from master lists of potential jurors in each Test Area created in the same manner master jury wheels for the federal districts are created. The accurately recorded results from the four Test Areas are presented side-by-side for this multi-district comparative study ("Study") so that the rate and intensity of bias in the DC Community can be viewed in comparison to the other Test Areas. This Study was guided by the American Society of Trial Consultants' Professional Standards for Venue Surveys[3] and is comprised of four qualified[4] opinion surveys to aid the Court in weighing the totality of circumstances, should it be asked to consider a motion to transfer venue or other questions concerning pretrial juror bias.

---

[1] Connie Meggs is a defendant in case 1:21-cr-00028-APM in D.D.C.; Thomas Edward Caldwell is a defendant in case 1:22-cr-00015-APM in D.D.C. Both cases are among multiple others listed on the U.S. Department of Justice website as "Capitol Breach Cases." https://www.justice.gov/usao-dc/capitol-breach-cases

[2] The United States District Court for the District of Columbia, the United States District Court for the Middle District of Florida - Ocala Division, the United States District Court for the Eastern District of North Carolina, and the United States District Court for the Eastern District of Virginia.

[3] https://www.astcweb.org/professional_code

[4] "'Qualified' means only that the survey be well-conceived, impartially conducted, and accurately recorded," see ABA Standards for Criminal Justice: Fair Trial and Free Press Standard 8-3.3. Change of venue or continuance (1992). "A survey should be acceptable even when it is conducted (as it usually is) at the behest and expense of an interested party," Corona v. Superior Court, 24 Cal. App. 3d 872 (1972).

## Key Findings

Results from the Study show that the DC Community's attitude is unique among the Test Areas - and is decidedly negative toward Defendants. While the Test Areas differ from each other in geographic location, demographic composition and political party alignment, the three other Test Areas produced remarkably similar results on most questions in the survey, with the DC Community standing apart. By measure, the DC Community attitude toward the Events of January 6th and toward **all** defendants associated with those events proves to be an outlier. The response distributions from the DC Community deviate considerably from both the medians and means of the response distributions throughout the Study[5].

Key differences between the DC Community and other Test Areas fall into at least five general categories: (1) prejudgment, (2) personal impact and perceived victimization, (3) exposure to information related to the case(s)[6], (4) recognition and disclosure of bias, and (5) eligible population size. Key findings from each category are detailed below:

### I.   Prejudicial Prejudgment

The Study shows that the DC Community is saturated with potential jurors who harbor actual bias against Defendants. In total, **91% of DC Community** respondents who answered all of the prejudgment test questions admit making **at least one prejudicial prejudgment** on issues related to the case(s), while the other Test Areas admit doing so at rates from 49% to 63%.[7] This bias is not only more prevalent in the DC Community, but it is also more intense. The DC Community also admits making more than one prejudicial prejudgment at a much higher rate than respondents from the other Test Areas. In fact, **30% of DC Community** respondents admit that they **have already made every prejudicial prejudgment tested for in the survey** – double the rate of the next highest Test Area[8].

Of the four questions used to test for prejudicial prejudgment, the DC Community indicates prejudging decisively against Defendants on each question, disclosing that it is more likely to find Defendants "guilty" than "not guilty" and opining that the Events of January 6th were criminal in nature, that **all** who entered the U.S. Capitol planned in advance to do so, and that **all** of the Events of January 6th were racially motivated. The three other Test Areas indicated much lower – and more similar - rates of prejudicial prejudgment[9]:

---

[5] Appendix B - Frequency Distribution Tables

[6] Specifically, case 1:21-cr-00028-APM in D.D.C. as to Meggs and case 1:22-cr-00015-APM in D.D.C. as to Caldwell, and, generally, any other similar case, including those listed on the U.S. Department of Justice website as "Capitol Breach Cases." https://www.justice.gov/usao-dc/capitol-breach-cases.

[7] Figure 2a.

[8] Figure 2d.

[9] Figure 1a-d.

- Q3. **72% of DC Community** respondents said that they are **likely to find Defendants guilty** – even when given the choice, "It is too early to decide." The median in the Study was 48%.

- Q5. 85% of the DC Community characterizes the Events of January 6th as acts that are criminal in nature (insurrection, attack or riot), even when given options to reserve judgment on that question. The median in the Study was 54%.

- Q6. 71% of the DC Community believes that **all** who entered the U.S. Capitol without authorization planned in advance to do so, even when offered options to reserve judgment on that question. The median in the Study was 49%.

- Q9. Over 40% of the DC Community stated they believe **all** the Events of January 6th were racially motivated, even when offered options to reserve judgment on that question. The median in the Study was 20%.

Respondents in all Test Areas overwhelmingly rejected answer choices that distinguish individual circumstances from the "group" of all people allegedly involved with the Events of January 6th, opting instead to generalize opinions to the group.

- Q6. asked respondents if they believe that individuals who entered the U.S. Capitol on January 6, 2021, had planned to do so in advance or if they had decided that day to do it. Only 12%-16% of respondents from the Test Areas selected the answer that indicates they would consider this question on a case-by-case basis ("Some planned to do so in advance, and some decided that day."). Another 4-9% said that they don't know. The remaining respondents, around 80% in each Test Area, held a single opinion about everyone included in the group.[10]

- Q9. asked respondents if they believe that the Events of January 6th were racially motivated. 3-5% in each Test Area said they did not know, while 8%-22% said, "Some were, and some weren't." The remaining 76%-89% from each Test Area responded to the question with a single opinion about the motivation for **all**, rejecting the option to acknowledge differences among the group.[11]

- Q3. asked respondents if they are more likely to find a defendant charged with crimes related to the Events of January 6th "guilty" or "not guilty" OR if it is "too early to decide." Only 18%-25% across the Test Areas think that it was too early to decide. Across the areas, 75%-82% of respondents proceeded to select how they are likely to vote if selected as a juror for such a defendant – without any details on the identity of the defendant, the circumstances of the case, the evidence or a defense.[12] Lacking any information about the hypothetical

---

[10] Figure 1c.
[11] Figure 1d.
[12] Figure 1a.

3

defendants, other than that they would be tried in relation to the Events of January 6th, the 75%-82% of respondents who selected anything other than "too early to decide" must have formed their opinions based on conclusions they had made about **all** defendants.

The results detailed above show that bias against individual defendants can be reasonably imputed from bias against the group of **all** defendants charged with crimes related to the Events of January 6th. Similarly, information about any one Defendant is likely to be generalized to all Defendants. All Test Areas indicate generalizing opinions about the Events of January 6th and Defendants, but the DC Community has generalized almost entirely negative opinions when doing so. The other Test Areas generalize but do so with mixed opinions, as demonstrated in their responses.

## II. Personal Impact and Perceived Victimization

The DC Community reports a unique association with Defendants and their case(s). Members of the DC Community claim high levels of personal impact and perceived victimization caused by the Events of January 6th, including feeling an increased concern for safety, experiencing restrictions on their free movement, identifying as a member of a group they believe was targeted, and by being "personally affected" by the Events of January 6th. In total, 82% of DC Community respondents who answered all of the personal impact and victimization questions reported feeling personally affected, being inconvenienced, having their free movement restricted, feeling increased concern for safety, or identifying with a group they believe was targeted by events at issue in the case(s).

One of the questions used to test for prejudgment, Q9., revealed a unique position the DC Community finds itself in with regards to Defendants and their case(s); 62% of the DC Community feels that some or all of events at issue were racially motivated[13], and most of the respondents who feel this way are non-white. 44% of the DC Community is a member of a group or class that they believe was targeted by events at issue in the case(s). In comparison, only 6%-18% of the potential jurors in the other Test Areas are expected to view the case(s) from this perspective.[14]

## III. Exposure to Information Related to the Case(s)

As noted above, most potential jurors have generalized opinions about all Defendants. This phenomenon could make it necessary to find jurors who have not formed any opinions

---

[13] Figure 1d.
[14] Figure 3d.

4

about the Events of January 6th or about any Defendants. Exposure to information about one Defendant may cause an opinion about another. Almost every potential respondent in all Test Areas was aware of the Events[15], but the other Test Areas had higher rates of potential jurors who are not regularly exposed to information. Almost three-quarters of the DC Community sees, reads or hears about the Events of January 6th at least several times per week, with roughly one-third of the DC Community exposed 10 or more times per week. This exposure comes from the media, local leaders and others from the community. Respondents from the three other Test Areas are more likely to avoid exposure to information from these sources. Compared to the DC Community, FL has 2.85x the rate of respondents exposed "never or almost never." NC has 2.65x the rate, and the VA community has 2.77x the rate of "never or almost never" exposed potential jurors available in comparison to the DC Community.[16]

## IV.    Recognition and Disclosure of Bias

The DC Community claims a greater capacity than the other Test Areas to be fair and impartial jurors for defendants charged with crimes related to the Events of January 6th. While promising on its face, this representation may actually indicate a failure to recognize or admit threats to fairness and impartiality. The same panel of respondents from the DC Community that overwhelmingly claims they could be fair and impartial also revealed making prejudicial prejudgments at a much higher rate and with more intensity than any other Test Area. 91% of DC Community respondents admitted making at least one prejudicial prejudgment on issues of the case(s), yet 70% of that panel later claimed they could be fair and impartial jurors.[18] Respondents in the DC Community demonstrate an inability to identify or unwillingness to report previously disclosed bias when asked if they could be a fair and impartial juror for a "January 6th" defendant.

## V.    Population

The results of this study are reported as frequencies, or rates of response, from each Test Area. To understand the conditions these rates indicate in the Test Area, the rates found in this Study can be applied to the eligible population number of the Test Area to calculate the estimated yield of potential jurors with that result. For example, using official voter registration numbers provided by election authorities[19] as a lower estimate of eligible population and the

---

[15] Appendix B - Frequency Distribution Tables at p. 1
[16] Figure 6.
[17] Figure 5.
[18] FL Middle county list: https://www.flmd.uscourts.gov/divisions
FL Middle voter statistics:
https://www.dos.myflorida.com/elections/data-statistics/voter-registration-statistics/voter-registration-reports/voter-registration-by-county-and-party/
NC Eastern county list: http://www.nced.uscourts.gov/counties/Default.aspx
NC Eastern voter statistics:  https://vt.ncsbe.gov/RegStat/
VA Eastern county list: https://www.vaed.uscourts.gov/eastern-district-virginia-jurisdiction
VA Eastern voter statistics: https://www.elections.virginia.gov/resultsreports/registration-statistics/2022-registration-statistics/

Census population numbers[19] as a higher estimate, a range of predicted yield can be calculated. High rates of bias in a smaller pool of eligible jurors, such as in the DC Community, will yield fewer acceptable jurors than the same rates of bias in a larger pool. Table 1. shows the results from several questions in the Study as applied to the range of eligible juror population estimates for each Test Area.

---

[19] https://www.census.gov/data/tables/time-series/demo/popest/2020s-counties-total.html



## Table 1.

A. Number of potential jurors who have **not made a prejudicial prejudgment** against Defendants.

| Test Area | Registered voters in federal district | Census population in federal district | Percent that have not made a prejudicial prejudgment | Estimated # of potential jurors from voter roll population | Estimated # of potential jurors from Census population |
|---|---|---|---|---|---|
| DC | 483,257 | 689,545 | 8.89% | 42,962 | 61,301 |
| FL | 7,505,432 | 10,908,580 | 50.65% | 3,801,501 | 5,525,196 |
| NC | 2,786,323 | 4,056,244 | 38.70% | 1,078,307 | 1,569,766 |
| VA | 4,286,237 | 6,064,194 | 36.58% | 1,567,905 | 2,218,282 |

B. Number of potential jurors who have **not decided** they are more likely to find Defendants **guilty**.

| Test Area | Registered voters in federal district | Census population in federal district | Percent who have not decided they are more likely to find Defendants guilty | Estimated # of potential jurors from voter roll population | Estimated # of potential jurors from Census population |
|---|---|---|---|---|---|
| DC | 483,257 | 689,545 | 28.11% | 135,844 | 193,831 |
| FL | 7,505,432 | 10,908,580 | 62.82% | 4,714,912 | 6,852,770 |
| NC | 2,786,323 | 4,056,244 | 51.83% | 1,444,151 | 2,102,351 |
| VA | 4,286,237 | 6,064,194 | 51.80% | 2,220,271 | 3,141,252 |

C. Number of potential jurors **"never or almost never" exposed** to information re: Events of Jan. 6.

| Test Area | Registered voters in federal district | Census population in federal district | Percent who are "never or almost never" exposed to information re: Events of Jan. 6. | Estimated # of potential jurors from voter roll population | Estimated # of potential jurors from Census population |
|---|---|---|---|---|---|
| DC | 483,257 | 689,545 | 4.83% | 23,341 | 33,305 |
| FL | 7,505,432 | 10,908,580 | 13.77% | 1,033,498 | 1,502,111 |
| NC | 2,786,323 | 4,056,244 | 12.78% | 356,092 | 518,388 |
| VA | 4,286,237 | 6,064,194 | 13.40% | 574,356 | 812,602 |

D. Number of potential jurors who **did not feel "personally affected,"** experience **restriction on their free movement**, feel increased **concern for their safety** or the safety of people important to them, or identify with a group that they believe was **targeted**.

| Test Area | Registered voters in federal district | Census population in federal district | Percent that didn't experience a personal impact or identify with a group they believe was targeted | Estimated # of potential jurors from voter roll population | Estimated # of potential jurors from Census population |
|---|---|---|---|---|---|
| DC | 483,257 | 689,545 | 18.15% | 87,725 | 125,172 |
| FL | 7,505,432 | 10,908,580 | 60.77% | 4,561,179 | 6,629,330 |
| NC | 2,786,323 | 4,056,244 | 52.74% | 1,469,499 | 2,139,252 |
| VA | 4,286,237 | 6,064,194 | 52.01% | 2,229,419 | 3,154,195 |

E. Number of potential jurors who do **not** identify with a group or class of people they believe was **targeted** by the Events of January 6th.

| Test Area | Registered voters in federal district | Census population in federal district | Percent who do not identify with a group or class of people they believe was targeted by Events of Jan. 6 | Estimated # of potential jurors from voter roll population | Estimated # of potential jurors from Census population |
|---|---|---|---|---|---|
| DC | 483,257 | 689,545 | 55.59% | 268,643 | 383,318 |
| FL | 7,505,432 | 10,908,580 | 94.24% | 7,073,119 | 10,280,246 |
| NC | 2,786,323 | 4,056,244 | 83.33% | 2,321,843 | 3,380,068 |
| VA | 4,286,237 | 6,064,194 | 82.25% | 3,525,430 | 4,987,800 |

Table 1.



| Figure 1. Prejudicial Prejudgment and Bias Against Defendants - Summary of Results |
|---|

**Q3. Are you more likely to find a defendant charged with crimes for activities on January 6th guilty or not guilty? Or is it too early to decide?**



| Q3. How would likely vote if juror: | Guilty | Not Guilty | Too Early to Decide |
|---|---|---|---|
| DC | 71.89% | 7.40% | 20.71% |
| FL | 37.18% | 43.52% | 19.31% |
| NC | 48.17% | 34.15% | 17.68% |
| VA | 48.20% | 26.35% | 25.45% |

**Q5. In your opinion, which of the following terms best characterizes The Events of January 6th?**



| Q5. Characterization of the Events of January 6: | Insurrection | Attack | Riot | Protest That Got Out of Control | Rally | Don't Know |
|---|---|---|---|---|---|---|
| DC | 55.66% | 16.21% | 12.84% | 12.23% | 1.83% | 1.22% |
| FL | 27.96% | 6.69% | 5.78% | 44.38% | 12.16% | 3.04% |
| NC | 30.65% | 9.35% | 11.61% | 31.29% | 13.55% | 3.55% |
| VA | 38.68% | 9.43% | 8.81% | 32.39% | 9.12% | 1.57% |

**Q6. Do you believe that the individuals who entered the Capitol on January 6th planned to do it in advance or decided to do it that day?**



| Q6. Planned in advance to enter Capitol or decided that day: | Planned in Advance | Some Planned in Advance; Some Decided That Day | Decided That Day | Don't Know |
|---|---|---|---|---|
| DC | 71.17% | 15.64% | 9.20% | 3.99% |
| FL | 39.44% | 13.66% | 37.58% | 9.32% |
| NC | 49.34% | 14.24% | 30.13% | 6.29% |
| VA | 48.40% | 12.18% | 34.94% | 4.49% |

**Q9. Do you believe The Events of January 6th were racially motivated?**



| Q9. Were the Events of January 6 racially motivated: | Yes - Racially Motivated | Some Were; Some Were Not | No - Not Racially Motivated | Don't Know |
|---|---|---|---|---|
| DC | 40.32% | 21.59% | 35.56% | 2.54% |
| FL | 11.22% | 7.69% | 78.21% | 2.88% |
| NC | 20.21% | 11.64% | 62.67% | 5.48% |
| VA | 19.80% | 13.76% | 63.76% | 2.68% |

Figure 1.



# Figure 2. Degree of Prejudicial Prejudgment - Summary of Results

Four questions (Q3., Q5., Q6., Q9.) were used to assess prejudicial bias arising from prejudgment on questions of the case. Options to reserve judgment were offered but were often rejected, especially by the DC Community. Over 91% of the DC Community has formed at least one opinion prejudicial to Defendants out of the four prejudgment questions. Almost 83% of the DC Community has made at least two prejudicial prejudgments out of four tested. Over 66% indicated making at least three, and almost 30% of the DC Community admits having already formed opinions prejudicial to Defendants on every prejudgment question.

Of respondents who answered all four prejudgment questions, how many made at least one prejudicial prejudgment?



Figure 2a.

| Did Respondent Make at Least One Prejudicial Prejudgment? | Yes - Made at Least One Prejudicial Prejudgment | No - Did Not Make at Least One Prejudicial Prejudgment |
|---|---|---|
| DC | 91.11% | 8.89% |
| FL | 49.35% | 50.65% |
| NC | 61.30% | 38.70% |
| VA | 63.42% | 36.58% |

Of respondents who answered all four prejudgment questions, how many made at least two prejudicial prejudgments?



Figure 2b.

| Did Respondent Make at Least Two Prejudicial Prejudgments? | Yes - Made at Least Two Prejudicial Prejudgments | No - Did Not Make at Least Two Prejudicial Prejudgments |
|---|---|---|
| DC | 82.54% | 17.46% |
| FL | 40.32% | 59.68% |
| NC | 51.37% | 48.63% |
| VA | 55.03% | 44.97% |

Of respondents who answered all four prejudgment questions, how many made at least three prejudicial prejudgments?



Figure 2c.

| Did Respondent Make at Least Three Prejudicial Prejudgments? | Yes - Made at Least Three Prejudicial Prejudgments | No - Did Not Make at Least Three Prejudicial Prejudgments |
|---|---|---|
| DC | 66.03% | 33.97% |
| FL | 31.29% | 68.71% |
| NC | 40.07% | 59.93% |
| VA | 43.29% | 56.71% |

Of respondents who answered all four prejudgment questions, how many made all four prejudicial prejudgments?



Figure 2d.

| Did Respondent Make All Four Prejudicial Prejudgments? | Yes - Made All Four Prejudicial Prejudgments | No - Did Not Make All Four Prejudicial Prejudgments |
|---|---|---|
| DC | 29.84% | 70.16% |
| FL | 9.68% | 90.32% |
| NC | 15.41% | 84.59% |
| VA | 15.10% | 84.90% |

Figure 2.



## Figure 3. Personal Impact and Perceived Victimization Within Jury Pool - Summary of Results

**Q2. Were you personally affected by The Events of January 6th?**



Figure 3a.

| Q2. Personally Affected by Events of January 6 | Yes - Personally Affected | No - Not Personally Affected | Not Sure/ Don't Remember |
|---|---|---|---|
| DC | 45.87% | 49.29% | 4.84% |
| FL | 23.56% | 71.51% | 4.93% |
| NC | 30.32% | 64.14% | 5.54% |
| VA | 23.86% | 70.17% | 5.97% |

**Q7. Have you experienced any inconvenience or restriction on your movement due to curfews, road closures or restricted access imposed in response to The Events of January 6th?**



Figure 3b.

| Q7. Restriction on Free Movement | Yes - Experienced Restriction | No - Did Not Experience Restriction | Not Sure/ Don't Remember |
|---|---|---|---|
| DC | 47.34% | 48.59% | 4.08% |
| FL | 5.40% | 90.48% | 4.13% |
| NC | 8.14% | 86.44% | 5.42% |
| VA | 15.08% | 80.66% | 4.26% |

**Q8. Have you experienced increased concern about your own safety or the safety of people important to you due to The Events of January 6th?**



Figure 3c.

| Q8. Increased Concern for Safety | Yes - Experienced Increased Concern | No - Did Not Experience Increased Concern | Not Sure/ Don't Remember |
|---|---|---|---|
| DC | 66.14% | 29.75% | 4.11% |
| FL | 27.07% | 68.47% | 4.46% |
| NC | 32.88% | 60.62% | 6.51% |
| VA | 36.67% | 59.33% | 4.00% |

**Does the Community identify as members of a group it believes was targeted by The Events of January 6th? (Q9., Race/ethnicity from Q15., Q16.)**



Figure 3d.

| Q15., Q16., Q9. Identify as Member of Group They Believe Was Targeted | Yes - Identify as Member of Group They Believe Was Targeted | Member of Group but Unsure if Targeted | No - Not a Member of Group OR Do Not Believe Group Was Targeted OR Both |
|---|---|---|---|
| DC | 44.41% | 1.36% | 54.24% |
| FL | 5.76% | 1.02% | 93.22% |
| NC | 16.67% | 1.81% | 81.52% |
| VA | 17.75% | 1.09% | 81.16% |

Figure 3.



| DC Community (% of the whole) | Claims Can Be Fair | Admits Not Fair | Unsure if Fair |
|---|---|---|---|
| Expects to Vote Guilty | 51% | 15% | 8% |
| Expects to Vote Not Guilty | 4% | 1% | 1% |
| Too Early to Decide | 16% | 2% | 4% |
| **FL Middle - Ocala (% of the whole)** | **Claims Can Be Fair** | **Admits Not Fair** | **Unsure if Fair** |
| Expects to Vote Guilty | 20% | 12% | 6% |
| Expects to Vote Not Guilty | 30% | 8% | 5% |
| Too Early to Decide | 10% | 4% | 3% |
| **NC Eastern (% of the whole)** | **Claims Can Be Fair** | **Admits Not Fair** | **Unsure if Fair** |
| Expects to Vote Guilty | 31% | 11% | 7% |
| Expects to Vote Not Guilty | 21% | 8% | 4% |
| Too Early to Decide | 13% | 1% | 4% |
| **VA Eastern (% of the whole)** | **Claims Can Be Fair** | **Admits Not Fair** | **Unsure** |
| Expects to Vote Guilty | 33% | 11% | 6% |
| Expects to Vote Not Guilty | 17% | 4% | 3% |
| Too Early to Decide | 19% | 4% | 3% |

Figure 4.



## Figure 5. Confidence in Fairness by Number of Prejudicial Prejudgments - Summary of Results

Q11. Respondents were asked if they could be fair and impartial jurors. The DC Community had more confidence in their ability to be fair when they had made all four prejudicial prejudgments than when they had not made any. The other Test Areas report lower confidence in their ability to be fair as their negative bias increases. The colored lines below demonstrate the trendlines of claims of fairness as bias increases. Bias was tested on Q3., Q5., Q6., Q9.



Figure 5.



| Figure 6. Exposure to Media and Other Information About the Case(s) |
| --- |

Q4. How often would you estimate that you see, read, or hear about the events of January 6th from either the Media, Local Leaders or the people around you?



| Q4. How Often See, Hear or Read About The Events of January 6th? | At Least 10 Times per Week | Several Times per Week | 1-2 Times per Week | Never or Almost Never |
| --- | --- | --- | --- | --- |
| DC | 32.02% | 41.09% | 22.05% | 4.83% |
| FL | 25.75% | 39.82% | 20.66% | 13.77% |
| NC | 25.24% | 39.30% | 22.68% | 12.78% |
| VA | 28.04% | 34.58% | 23.99% | 13.40% |

Figure 6.



STUDY DESIGN AND METHODOLOGY

A. Overview

If a jury is to reflect the voice of the community, then the voice of the community can speak for its jury. Finding the real truth in the community voice, however, depends on first asking the appropriate questions in the appropriate way to the appropriate people. The findings contained in this report are the results of a good-faith effort to do all of these things to the greatest extent possible.  To complete this comparative community attitude study ("Study"), In Lux Research ("ILR") deployed an identical community attitude survey ("CAS") in four separate federal venue units, the United States District Court for the District of Columbia, the United States District Court for the Middle District of Florida – Ocala Division, the United States District Court for the Eastern District of North Carolina, and the United States District Court for the Eastern District of Virginia (collectively the "Test Areas"). To eliminate any difference in the delivery of survey questions and any resulting bias, an identical, pre-recorded survey script was used to facilitate the interviews in all cases. Individuals randomly selected from the eligible jury pool in each Test Area were contacted telephonically. The survey questionnaire and responses were exchanged through an interactive voice response ("IVR") method, which controls the presentation of the survey questions, captures responses entered via touchtone, and prompts respondents to answer questions. This standardized, structured method was selected for a number of reasons, namely that respondents were afforded a private environment for participation and that responses were not subject to any influence or interpretation by interviewers.

No training of interviewers was required, as interviewers were not used beyond the recording of the audio file used for the pre-recorded interview. In fact, no interpretation of actual responses was required for this Study. Any inferences and calculations made from results were made equally and uniformly across all Test Areas. The Study is intended to be fully replicable, and the raw data has been preserved. Interviews were conducted on exactly the same days in each Test Area between February 14 and March 16, 2022. The average

completed interview took respondents just over seven minutes to finalize, which is under the ten-minute limit recommended by the American Society of Trial Consultants' Professional Standards for Venue Surveys ("ASTC Standards"), which advise that longer studies can decrease both the response rate and the reliability of data. This Study avoided these risks by utilizing a design that facilitated a favorable survey length.

B.  Eligibility and Sampling

So that sampling of fair cross-sections representative of realistic juries would naturally occur in the Study, every reasonable effort was taken to replicate official processes used to create master jury wheels and summon jurors[1] when creating the master lists and randomly selecting for inclusion in the Study. The Study's master lists were created, primarily, with a complete and then-current list of voters in each Test Area and, secondarily, with a supplemental list of consumers in each Test Area. Any duplicate records coming in with the second list were removed prior to the merging of the lists into the master list. Respondent households were randomly selected from the master lists of likely eligible jurors within each Test Area's boundaries. In line with the ASTC Standards, all eligible households[2] in each Test Area had an equal and known nonzero chance of being chosen and an equal and nonzero chance of an having an eligible respondent interviewed. Each phone number randomly selected was called back up to seven times, or until contact was made, on various days of the week and at different times of the day.

C.  Demographics and Representativeness

Questions to obtain demographic characteristics of survey respondents were asked after the more probative questions. The Study gathered information on gender, age, education, race, ethnicity and political party, which can be compared to available objective data to confirm representativeness. Distributions of responses to these questions are documented at Appendix A (pages 3-4) and indicate that a fair cross-section of each Test Area was achieved.

D.  The Questionnaire

---

[1] https://www.dcd.uscourts.gov/sites/dcd/files/JurySelectionPlan.pdf
[2] Only households with an available phone number were contacted.

In an effort to measure only existing public opinion related to these cases, special care was taken not to influence survey respondents' opinions in any particular direction and not to present systematically biased information. The intent of the Study was to detect honest opinions, so every effort was made to create an environment conducive to this end. Single response questions, where respondents make one choice from among several clear options per question, were administered by a recorded female, accent-neutral voice. Each CAS utilized the same audio file, in the same order, to conduct every interview. The survey introduction included neutral explanations that described the auspices under which the survey was being conducted, specifically that the survey was being conducted in their area to document how residents "really feel about several issues" and that the "results would be compared to other polls and reports covering the same topics."[3] The wording and tone of the introduction was such that it would be impossible to infer any desirable/undesirable response or any motivation for conducting the CAS, other than to collect honest opinions on several issues and compare the results to the results of other surveys on the same issues. In utilizing such neutral language, the introduction avoided the effects of indirect screening and non-response bias.

By agreeing to continue, respondents indicated they would provide information on how they "really feel about several issues." While it is impossible to know if any respondent intentionally gave dishonest answers, there is no obvious incentive to do so in this context. Any differences between responses offered in this environment and those elicited in the jury selection process should be considered in recognition of the various motivations for being less forthcoming in the jury selection process and the unlikelihood of any such motivations to advocate against one's beliefs on an opinion survey.

E. Screening

There are limitations in screening survey respondents to the same degree one would be screened for jury service eligibility. For example, asking questions sufficient to reveal all disqualifying or exempting factors or about the exercise of an acceptable excuse would result in such long and numerous questions that respondents could become frustrated and confused. Differences in tolerance for this could create an undesirable non-response bias more detrimental to quality than any resulting overinclusion might cause. Asking too many questions

---

[3] Appendix A - Questionnaire at p. 1

about eligibility after employing proper sampling procedures would squander an opportunity to ask probative questions of more value at the expense of confirming something already established.

Respondents were asked one screening question at the end of the interview confirming that they are either "registered to vote or have a driver license." This question was used to validate the appropriateness of the Study's source lists, which included, primarily, a complete and then-current list of voters in each Test Area and, secondarily, a supplemental list of consumers in each Test Area, with duplicate phone numbers removed. Voter rolls restrict eligibility based on several of the same statuses that may disqualify potential jurors (e.g., lack of citizenship, criminal status, inclusion on another jurisdiction's list), and the ability to understand English was imputed by the respondent's offering of valid responses to the CAS. Because inclusion on the voter rolls was ascertained contemporaneously with deployment of the Study, the threat of stale voter files producing unacceptable numbers of ineligible individuals was lower than found in jury summoning where lists possibly created years prior are used for summoning jurors. Further, many people are registered to vote but do not know that they are registered, resulting in the Study having superior knowledge of voter status in some cases. The nearly absolute proportion of respondents who did not deny being registered to vote or having a driver license (97.45% for the Study)[4], considered with the high percentage of the Study's master list made up of current and valid registered voters, with their most recent phone number appended, shows that the master lists used for each Test Area sufficiently screened for inclusion in a "qualified study."[5]

After each eligible respondent agreed to participate, the interview began with an instruction that respondents could push zero at any time to repeat a question. Additionally, the survey automatically repeated a question two times if no response was given, before marking it as having no response and continuing to the next question. Repeating questions and moving past questions to which respondents offer no timely answer allows the greatest opportunity for respondents to clearly understand every question before answering and ensures that all

---

[4] Appendix B – Frequency Distribution Tables at p.4
[5] "'Qualified' means only that the survey be well-conceived, impartially conducted, and accurately recorded," see ABA Standards for Criminal Justice: Fair Trial and Free Press Standard 8-3.3. Change of venue or continuance (1992). "A survey should be acceptable even when it is conducted (as it usually is) at the behest and expense of an interested party," Corona v. Superior Court, 24 Cal. App. 3d 872 (1972).

answers were provided with a clear understanding of the question. When a question went unanswered, that response was not included in the total responses figure among valid answers but was recorded as "no answer" and listed separately below the valid response area on the frequency distribution tables.

F. Questions to Measure Awareness of the Events of January 6th and of Defendants

The first question of the survey questionnaire asks respondents if they are "… aware of the demonstrations that took place at the U.S. Capitol Building on January 6, 2021[.]" The purpose of this question was, as suggested by the ASTC Standards, to identify the proportion of the eligible population that is aware of events central to the cases against Defendants. The U.S. Department of Justice hosts a webpage with a list of defendants, including Defendants, it describes as "… charged in federal court in the District of Columbia related to crimes committed at the U.S. Capitol in Washington, D.C, on Wednesday, Jan. 6, 2021." The webpage is titled "Capitol Breach Cases."[6] These events are also commonly referred to as "January 6th," "J6," the "Capitol Insurrection", an "attack on the Capitol," the "Capitol Riots," the "Capitol Siege," the "Capitol Breach," "protests", "demonstrations," "a rally," and various other names. The word "demonstrations" was selected to communicate this question to respondents because ILR considers it to be the most neutral word that could point respondents to the Events in question with the necessary specificity. This specificity is important because only respondents who claimed to know about the "demonstrations that took place at the U.S. Capitol Building on January 6, 2021" were counted in the results of the Study, as its objective was to investigate their attitudes about those events and Defendants, who are charged with crimes related to those events. Had that opening question been at all slanted, various forms of bias would have been inflicted on the Study, compromising its evidentiary value.

G. Questions to Measure Respondents' Prejudgment of a Case

The Study asks respondents how they are likely to vote if called as a juror for a January 6th defendant.[7] This is a step beyond simply asking for predictions of how respondents predict a case end up; this scenario places them in a position to reveal any prejudgment. Answers to

---

[6] https://www.justice.gov/usao-dc/capitol-breach-cases
[7] Appendix A – Questionnaire at p. 1

this question (Q3.) are the predictions – from the respondents themselves - of how they are likely to find Defendants if chosen as a juror. This is a direct question to detect a shifted burden arising from a presumption of guilt. In addition to "guilty" and "not guilty," respondents were offered the option of choosing that it is "too early to decide," usually a gentle reminder of the socially acceptable response, but that option was declined most of the time. Offering such a socially acceptable response risks inflating the rate of the ideal answer, but ILR chose to give that option, rather than forcing respondents to make a prejudgment. Even so, only about 20% of respondents across the Test Areas think it is too early to decide how they would vote to find a January 6th defendant, including Defendants, even without specifics on the Defendant, the charges, the circumstances, testimony, evidence or a defense. Most respondents did not require a trial or evidence at all to make this decision, let alone a fair trial. In fact, 72% of the DC Test Area presumes it would find Defendants guilty. 48% of both the VA Eastern and NC Eastern Test Areas presume they would find Defendants guilty, and 37% of the FL Middle – Ocala Division presumes it would find Defendants guilty.[8]

"January 6th" cases are extraordinary in that there are hundreds of defendants and a less discernable victim than in most other instances such a test of awareness might be undertaken. Consideration was given at the outset of the Study to including specific names of Defendants, but, given the sheer number of defendants in all related cases and the relatively small population of the District of Columbia, ILR felt that it might be unreasonable to presume that every defendant could conduct a similar study without significantly depleting both the survey respondent pool and the available jury pool and risking actual contact with eventual jurors. ILR elected to launch a pilot deployment of the survey with a questionnaire that offers answer choices that give options to generalize opinions to all Defendants, to acknowledge distinctions between Defendants, and to reserve judgment. The survey is well-suited to ascertain whether respondents' opinions would be materially different if given names of specific individuals or groups. After reviewing preliminary results from the pilot test period, it was clear that repeated offers to differentiate between defendants were largely rejected, as described in full detail below. Essentially, it became apparent that respondents, generally, did not care about the specifics. They issued and reserved judgment based on information they

---

[8] Figure 1a.; Appendix B – Frequency Distribution Tables at p. 1

had or on the acknowledgment that they did not have the necessary information about any Defendant at the time of the survey.  In a conscious effort to prevent potential jurors from learning information about the Events and Defendants from the Study, which would be in conflict with the ASTC Standards, ILR decided that using specific Defendants' names in the Study would unnecessarily increase the risk of confusion during the survey and could create or reinforce bias, with no expected improvement to the reliability of the results. Therefore, ILR found that the existing script and recordings for the survey were ideal for the circumstances, and the pilot deployment transitioned to a full deployment of the surveys, as suggested by the ASTC Standards.

The Study aimed to fully test whether each Defendant's name needs to be used in a CAS to detect actual bias or support a finding of presumed bias against that Defendant. Several questions in the Study offered answers that invited respondents to acknowledge that January 6th defendants should be individually considered on questions of guilt, motivation, premeditation and participation. Respondents repeatedly declined to accept this proposition and, instead, made the same prejudgments or held the same opinion about ALL defendants.[9] There are differences among and between the Test Areas on the how these generalized opinions break. The results of this Study reveal those differences. Because respondents overwhelmingly show no interest in considering any one January 6th defendant as different from the group of all defendants, it was not necessary to interpose names into the survey questions at the time this Study was conducted. Doing so could have created or reinforced prejudicial associations between Defendants and with the Events of January 6th. Requiring such specificity could lead to multiple, redundant surveys being conducted in the District of Columbia Community and could actually inject bias into the Community if not performed in a neutral, non-biasing way.

---

[9] Q3. Figure 1a.; Appendix B – Frequency Distribution Tables at p.1
Q6. Figure 1c.; Appendix B – Frequency Distribution Tables at p.2
Q9. Figure 1d.; Appendix B – Frequency Distribution Tables at p.2

*Lindsay Olson*

8383 Wilshire Blvd. Suite 935
Beverly Hills, CA 90211
contact@inluxresearch.com



# Comparative Community Attitude Study
## re: The Events of January 6ᵗʰ and Defendants Charged in Relation

### Survey Questionnaire – Script for Recorded Interview

Currently, we are conducting a poll in your area to document how residents REALLY feel about several issues - and then comparing our results to other polls and reports covering the same topics.

We would like to include your opinions in our baseline study. Are you willing to spend a few minutes sharing your opinions with me today?
1| If yes, press 1 (go to Instruction)
2| If no, press 2 (TERMINATE)
9| To be added to my Do Not Call list, press 9 (TERMINATE)


Instruction: Great. Thank you for offering to share your opinion. You may press 0 after any question to have it repeated.

   Q1. Are you aware of the demonstrations that took place at the U.S. Capitol Building on January 6, 2021?
1|Yes
2|No
3|If you are Not Sure

   Q2. Were you personally affected by the events of January 6th?
1|Yes
2|No
3|If you are unsure or don't remember

   Q3. Are you more likely to find a defendant charged with crimes for activities on January 6th guilty or not guilty? Or is it too early to decide?
1|Guilty
2|Not guilty
3|It's too early to decide.

   Q4. How often would you estimate that you see, read or hear about the events of January 6th from either the Media, Local Leaders or the people around you?
1|At least 10 times a week
2|Several times a week
3|Once or twice a week
4|Never or Almost Never

Q5. In your opinion, which of the following terms best characterizes
The Events of January 6th?
1|An insurrection
2|An attack
3|A riot
4|A protest that got out of control
5|A rally
6|If you don't know

Q6. Do you believe that the individuals who entered the Capitol on
January 6th planned to do it in advance or decided to do it that day?
1|If you think participants planned to enter the Capitol in advance
2|If you think they decided to do it that day
3|If you think some planned in advance to do it, and some decided that
day.
4|If you do not have enough information to form an opinion at this
time.


We want to know if you were personally affected by The Events of January
6th. Please tell me if you feel that you experienced any of the following
as a result of The Events of January 6th.
[READ THE SUMMARY OF THE TOPIC AND THEN THE QUESTION TO BE SURE EVERYBODY HAS A
CHANCE TO PROCESS THE QUESTION BEFORE IT IS TIME TO ANSWER.]

Q7. Inconvenience or restriction on your movement –
Have you experienced any restriction on your movement due to curfews,
road closures or restricted access imposed in response to the Events
of January 6th?
1|Yes
2|No
3|If you are unsure or don't remember

Q8. Increased concern about your own safety or the safety of people
important to you –
Have you experienced increased concern about your own safety or the
safety of people important to you due to The Events of January 6th?
1|Yes
2|No
3|If you are unsure or don't remember

Q9. Do you believe The Events of January 6th were racially motivated?
1|Yes
2|No
3|Some were, some weren't.
4|If you don't know

Q10. If you were a juror, would you worry that finding a January 6th
defendant Not Guilty would be an unpopular decision that might impact
your career or friendships?
1|Yes
2|No
3|Maybe

Q11. Would it be possible for you to be a fair and unbiased juror for a January 6th Defendant?
1|Yes
2|No
3|Maybe

Q12. Do you believe your neighbors would be fair and unbiased jurors for a January 6th Defendant?
1|Yes
2|No
3|Maybe

To be sure all members of the community are fairly represented in this study, we will close with a few demographic questions.

Q13. What is your gender?
1|Male
2|Female

Q14. In which category does your age fall?
1|18-34
2|35-49
3|50-64
4|65 and up

Q15. Are you Hispanic?
1|Yes
2|No

Q16. What is your race?
1|White
2|Black/African American
3|Asian
4|Two or more races

Q17. What is your highest level of education?
1|Have not earned a high school diploma
2|High school graduate or equivalent
3|Some college, no degree
4|Associate degree or technical certificate
5|Bachelor's degree
6|Graduate or professional degree

Q18. With which Political Party do you most closely identify?
1|Republican
2|Democrat
3|Independent
4|Another party
5|Unsure

Q19. Are you registered to vote OR do you have a driver's license?
1|Yes
2|No
3|Not sure
Thank you for sharing your opinions with me today. We can be reached at [PHONE].

APPENDIX A – Questionnaire
Page 3



| All Area Total | | | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1521 | Agreed to survey | 100.00% | 100.00% | 379 | 100.00% | 389 | 100.00% | 369 | 100.00% | 384 | 100.00% |
| | 1450 | Qualified after screening | 95.55% | 95.32% | 364 | 96.04% | 374 | 96.14% | 347 | 94.04% | 365 | 95.05% |

| # of Responses by Test Area | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DC | 378 | 24.88% | Q1. | | AWARE EVENTS January6 | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
| FL | 388 | 25.54% | 1417 | Yes | 93.60% | 93.27% | 352 | 93.12% | 365 | 94.07% | 338 | 91.60% | 362 | 94.27% |
| NC | 369 | 24.29% | 71 | No | 4.46% | 4.69% | 15 | 3.97% | 15 | 3.87% | 22 | 5.96% | 19 | 4.95% |
| VA | 384 | 25.28% | 31 | Not sure | 2.25% | 2.05% | 11 | 2.91% | 8 | 2.06% | 9 | 2.44% | 3 | 0.78% |
| ALL | 1519 | 100.00% | 1519 | Total answered | 100.00% | 100.00% | 378 | 100.00% | 388 | 100.00% | 369 | 100.00% | 384 | 100.00% |
| | | | | No Answer | | | 1 | 0.26% | 1 | 0.26% | 0 | 0.00% | 0 | 0.00% |
| | | | | Total Asked | | | 379 | | 389 | | 369 | | 384 | |
| | | | | Valid Rate | | | Valid % | 99.74% | Valid % | 99.74% | Valid % | 100.00% | Valid % | 100.00% |

| DC | 351 | 24.88% | Q2. | | PERSONALLY AFFECTED | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FL | 365 | 25.87% | 435 | Yes | 27.09% | 30.90% | 161 | 45.87% | 86 | 23.56% | 104 | 30.32% | 84 | 23.86% |
| NC | 343 | 24.31% | 901 | No | 67.16% | 63.78% | 173 | 49.29% | 261 | 71.51% | 220 | 64.14% | 247 | 70.17% |
| VA | 352 | 24.95% | 75 | Not sure/don't remember | 5.24% | 5.32% | 17 | 4.84% | 18 | 4.93% | 19 | 5.54% | 21 | 5.97% |
| ALL | 1411 | 100.00% | 1411 | Total | 100.00% | 100.00% | 351 | 100.00% | 365 | 100.00% | 343 | 100.00% | 352 | 100.00% |
| | | | | No Answer | | | 13 | 3.57% | 9 | 2.41% | 4 | 1.15% | 13 | 3.56% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 96.43% | Valid % | 97.59% | Valid % | 98.85% | Valid % | 96.44% |

| DC | 338 | 25.09% | Q3. | | YOU VOTE GUILTY NOTGUILTY | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FL | 347 | 25.76% | 691 | Guilty | 48.19% | 51.36% | 243 | 71.89% | 129 | 37.18% | 158 | 48.17% | 161 | 48.20% |
| NC | 328 | 24.35% | 376 | Not guilty | 30.25% | 27.85% | 25 | 7.40% | 151 | 43.52% | 112 | 34.15% | 88 | 26.35% |
| VA | 334 | 24.80% | 280 | Too early to decide | 20.01% | 20.79% | 70 | 20.71% | 67 | 19.31% | 58 | 17.68% | 85 | 25.45% |
| ALL | 1347 | 100.00% | 1347 | Total | 100.00% | 100.00% | 338 | 100.00% | 347 | 100.00% | 328 | 100.00% | 334 | 100.00% |
| | | | | No Answer | | | 26 | 7.14% | 27 | 7.22% | 19 | 5.48% | 31 | 8.49% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 92.86% | Valid % | 92.78% | Valid % | 94.52% | Valid % | 91.51% |

| | | | Q4. | | HOW OFTEN EXPOSED | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DC | 331 | 25.48% | 361 | 10+/week | 26.89% | 27.76% | 106 | 32.02% | 86 | 25.75% | 79 | 25.24% | 90 | 28.04% |
| FL | 334 | 25.71% | 503 | Several/week | 39.56% | 38.70% | 136 | 41.09% | 133 | 39.82% | 123 | 39.30% | 111 | 34.58% |
| NC | 313 | 24.10% | 290 | 1-2/week | 22.37% | 22.35% | 73 | 22.05% | 69 | 20.66% | 71 | 22.68% | 77 | 23.99% |
| VA | 321 | 24.71% | 145 | Never/almost never | 13.09% | 11.20% | 16 | 4.83% | 46 | 13.77% | 40 | 12.78% | 43 | 13.40% |
| ALL | 1299 | 100.00% | 1299 | Total | 100.00% | 100.00% | 331 | 100.00% | 334 | 100.00% | 313 | 100.00% | 321 | 100.00% |
| | | | | No Answer | | | 33 | 9.07% | 40 | 10.70% | 34 | 9.80% | 44 | 12.05% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 90.93% | Valid % | 89.30% | Valid % | 90.20% | Valid % | 87.95% |

## Q5. CHARACTERIZE EVENTS January6

| | Count | % |
|---|---|---|
| DC | 327 | 25.47% |
| FL | 329 | 25.62% |
| NC | 310 | 24.14% |
| VA | 318 | 24.77% |
| ALL | 1284 | 100.00% |

| Q5. CHARACTERIZE EVENTS January6 | | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 492 | Insurrection (1) | 34.66% | 38.24% | 182 | 55.66% | 92 | 27.96% | 95 | 30.65% | 123 | 38.68% |
| 134 | Attack (2) | 9.39% | 10.42% | 53 | 16.21% | 22 | 6.69% | 29 | 9.35% | 30 | 9.43% |
| 125 | Riot (3) | 10.21% | 9.76% | 42 | 12.84% | 19 | 5.78% | 36 | 11.61% | 28 | 8.81% |
| 386 | Protest that got out of control (4) | 31.84% | 30.07% | 40 | 12.23% | 146 | 44.38% | 97 | 31.29% | 103 | 32.39% |
| 117 | Rally (5) | 10.64% | 9.17% | 6 | 1.83% | 40 | 12.16% | 42 | 13.55% | 29 | 9.12% |
| 30 | Not sure/don't know (6) | 2.31% | 2.35% | 4 | 1.22% | 10 | 3.04% | 11 | 3.55% | 5 | 1.57% |
| 1284 | Total | 100.00% | 100.00% | 327 | 100.00% | 329 | 100.00% | 310 | 100.00% | 318 | 100.00% |
| | No Answer | | | 37 | 10.16% | 45 | 12.03% | 37 | 10.66% | 47 | 12.88% |
| | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | Valid Rate | | | Valid % | 89.84% | Valid % | 87.97% | Valid % | 89.34% | Valid % | 87.12% |

| From Q5. Criminality of Events | | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 751 | Criminal in nature (1)+(2)+(3) | 54.27% | 58.49% | 277 | 84.71% | 133 | 40.43% | 160 | 51.61% | 181 | 56.92% |
| 416 | Possibly criminal/unsure (4)+(6) | 34.40% | 32.40% | 44 | 13.46% | 156 | 47.42% | 108 | 34.84% | 108 | 33.96% |
| 117 | Not criminal in nature (5) | 10.64% | 9.11% | 6 | 1.83% | 40 | 12.16% | 42 | 13.55% | 29 | 9.12% |
| 1284 | Total | 100.00% | 100.00% | 327 | 100.00% | 329 | 100.00% | 310 | 100.00% | 318 | 100.00% |

## Q6. PLANNED OR THAT DAY

| | Count | % |
|---|---|---|
| DC | 326 | 25.83% |
| FL | 322 | 25.52% |
| NC | 302 | 23.93% |
| VA | 312 | 24.72% |
| ALL | 1262 | 100.00% |

| Q6. PLANNED OR THAT DAY | | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 659 | Planned in advance | 48.87% | 52.22% | 232 | 71.17% | 127 | 39.44% | 149 | 49.34% | 151 | 48.40% |
| 351 | Decided that day | 32.53% | 27.81% | 30 | 9.20% | 121 | 37.58% | 91 | 30.13% | 109 | 34.94% |
| 176 | Some planned, some didn't | 13.95% | 13.95% | 51 | 15.64% | 44 | 13.66% | 43 | 14.24% | 38 | 12.18% |
| 76 | Not sure/not enough info | 5.39% | 6.02% | 13 | 3.99% | 30 | 9.32% | 19 | 6.29% | 14 | 4.49% |
| 1262 | Total | 100.00% | 100.00% | 326 | 100.00% | 322 | 100.00% | 302 | 100.00% | 312 | 100.00% |
| | No Answer | | | 38 | 10.44% | 52 | 13.90% | 45 | 12.97% | 53 | 14.52% |
| | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | Valid Rate | | | Valid % | 89.56% | Valid % | 86.10% | Valid % | 87.03% | Valid % | 85.48% |

## Q7. RESTRICTED MOVEMENT

| | Count | % |
|---|---|---|
| DC | 319 | 25.85% |
| FL | 315 | 25.53% |
| NC | 295 | 23.91% |
| VA | 305 | 24.72% |
| ALL | 1234 | 100.00% |

| Q7. RESTRICTED MOVEMENT | | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 238 | Yes | 11.61% | 19.29% | 151 | 47.34% | 17 | 5.40% | 24 | 8.14% | 46 | 15.08% |
| 941 | No | 83.55% | 76.26% | 155 | 48.59% | 285 | 90.48% | 255 | 86.44% | 246 | 80.66% |
| 55 | Not sure/don't remember | 4.19% | 4.46% | 13 | 4.08% | 13 | 4.13% | 16 | 5.42% | 13 | 4.26% |
| 1234 | Total | 100.00% | 100.00% | 319 | 100.00% | 315 | 100.00% | 295 | 100.00% | 305 | 100.00% |
| | No Answer | | | 45 | 12.36% | 59 | 15.78% | 52 | 14.99% | 60 | 16.44% |
| | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | Valid Rate | | | Valid % | 87.64% | Valid % | 84.22% | Valid % | 85.01% | Valid % | 83.56% |

## Q8. CONCERN SAFETY

| | Count | % |
|---|---|---|
| DC | 316 | 25.86% |
| FL | 314 | 25.70% |
| NC | 292 | 23.90% |
| VA | 300 | 24.55% |
| ALL | 1222 | 100.00% |

| Q8. CONCERN SAFETY | | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 500 | Yes | 34.77% | 40.92% | 209 | 66.14% | 85 | 27.07% | 96 | 32.88% | 110 | 36.67% |
| 664 | No | 59.97% | 54.34% | 94 | 29.75% | 215 | 68.47% | 177 | 60.62% | 178 | 59.33% |
| 58 | Not sure/don't remember | 4.29% | 4.75% | 13 | 4.11% | 14 | 4.46% | 19 | 6.51% | 12 | 4.00% |
| 1222 | Total | 100.00% | 100.00% | 316 | 100.00% | 314 | 100.00% | 292 | 100.00% | 300 | 100.00% |
| | No Answer | | | 48 | 13.19% | 60 | 16.04% | 55 | 15.85% | 65 | 17.81% |
| | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | Valid Rate | | | Valid % | 86.81% | Valid % | 83.96% | Valid % | 84.15% | Valid % | 82.19% |

## Q9. RACIALLY MOTIVATED

| | Count | % |
|---|---|---|
| DC | 315 | 25.88% |
| FL | 312 | 25.64% |
| NC | 292 | 23.99% |
| VA | 298 | 24.49% |
| ALL | 1217 | 100.00% |

| Q9. RACIALLY MOTIVATED | | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 280 | Yes | 20.00% | 23.01% | 127 | 40.32% | 35 | 11.22% | 59 | 20.21% | 59 | 19.80% |
| 729 | No | 63.21% | 65.90% | 112 | 35.56% | 244 | 78.21% | 183 | 62.67% | 190 | 63.76% |
| 167 | Some were, some weren't | 12.70% | 13.72% | 68 | 21.59% | 24 | 7.69% | 34 | 11.64% | 41 | 13.76% |
| 41 | Don't know | 2.78% | 3.37% | 8 | 2.54% | 9 | 2.88% | 16 | 5.48% | 8 | 2.68% |
| 1217 | Total | 100.00% | 100.00% | 315 | 100.00% | 312 | 100.00% | 292 | 100.00% | 298 | 100.00% |
| | No Answer | | | 49 | 13.46% | 62 | 16.58% | 55 | 15.85% | 67 | 18.36% |
| | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | Valid Rate | | | Valid % | 86.54% | Valid % | 83.42% | Valid % | 84.15% | Valid % | 81.64% |

| | | | Q10. | NOTGUILTY NEG EFFECTS | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DC | 311 | 25.85% | | | | | | | | | | | | |
| FL | 311 | 25.85% | 226 | Yes | 18.92% | 18.79% | 60 | 19.29% | 55 | 17.68% | 57 | 19.66% | 54 | 18.56% |
| NC | 290 | 24.11% | 786 | No | 65.23% | 65.34% | 202 | 64.95% | 199 | 63.99% | 190 | 65.52% | 195 | 67.01% |
| VA | 291 | 24.19% | 191 | Maybe | 15.29% | 15.88% | 49 | 15.76% | 57 | 18.33% | 43 | 14.83% | 42 | 14.43% |
| ALL | 1203 | 100.00% | 1203 | Total | 100.00% | 100.00% | 311 | 100.00% | 311 | 100.00% | 290 | 100.00% | 291 | 100.00% |
| | | | | No Answer | | | 53 | 14.56% | 63 | 16.84% | 57 | 16.43% | 74 | 20.27% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 85.44% | Valid % | 83.16% | Valid % | 83.57% | Valid % | 79.73% |

| | | | Q11. | POSSIBLE YOU BE FAIR | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DC | 308 | 25.75% | | | | | | | | | | | | |
| FL | 310 | 25.92% | 796 | Could | 67.45% | 66.56% | 216 | 70.13% | 190 | 61.29% | 187 | 65.38% | 203 | 69.52% |
| NC | 286 | 23.91% | 243 | Could Not | 19.73% | 20.32% | 54 | 17.53% | 75 | 24.19% | 58 | 20.28% | 56 | 19.18% |
| VA | 292 | 24.41% | 157 | Maybe | 13.34% | 13.13% | 38 | 12.34% | 45 | 14.52% | 41 | 14.34% | 33 | 11.30% |
| ALL | 1196 | 100.00% | 1196 | Total | 100.00% | 100.00% | 308 | 100.00% | 310 | 100.00% | 286 | 100.00% | 292 | 100.00% |
| | | | | No Answer | | | 56 | 15.38% | 64 | 17.11% | 61 | 17.58% | 73 | 20.00% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 84.62% | Valid % | 82.89% | Valid % | 82.42% | Valid % | 80.00% |

| | | | Q12. | POSSIBLE NEIGHBORS FAIR | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DC | 308 | 25.80% | | | | | | | | | | | | |
| FL | 309 | 25.88% | 525 | Yes | 43.00% | 43.97% | 164 | 53.25% | 113 | 36.57% | 129 | 45.10% | 119 | 40.89% |
| NC | 286 | 23.95% | 295 | No | 24.08% | 24.71% | 62 | 20.13% | 94 | 30.42% | 66 | 23.08% | 73 | 25.09% |
| VA | 291 | 24.37% | 374 | Maybe | 32.41% | 31.32% | 82 | 26.62% | 102 | 33.01% | 91 | 31.82% | 99 | 34.02% |
| ALL | 1194 | 100.00% | 1194 | Total | 100.00% | 100.00% | 308 | 100.00% | 309 | 100.00% | 286 | 100.00% | 291 | 100.00% |
| | | | | No Answer | | | 56 | 15.38% | 65 | 17.38% | 61 | 17.58% | 74 | 20.27% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 84.62% | Valid % | 82.62% | Valid % | 82.42% | Valid % | 79.73% |

| | | | Q13. | GENDER | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DC | 302 | 25.90% | | | | | | | | | | | | |
| FL | 300 | 25.73% | 543 | Male | 46.43% | 46.57% | 122 | 40.40% | 152 | 50.67% | 119 | 42.20% | 150 | 53.19% |
| NC | 282 | 24.19% | 623 | Female | 53.57% | 53.43% | 180 | 59.60% | 148 | 49.33% | 163 | 57.80% | 132 | 46.81% |
| VA | 282 | 24.19% | 1166 | Total | 100.00% | 100.00% | 302 | 100.00% | 300 | 100.00% | 282 | 100.00% | 282 | 100.00% |
| ALL | 1166 | 100.00% | | No Answer | | | 62 | 17.03% | 74 | 19.79% | 65 | 18.73% | 83 | 22.74% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 82.97% | Valid % | 80.21% | Valid % | 81.27% | Valid % | 77.26% |

| | | | Q14. | AGE | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DC | 299 | 25.78% | 53 | 18-34 | 4.68% | 4.57% | 12 | 4.01% | 16 | 5.35% | 7 | 2.49% | 18 | 6.41% |
| FL | 299 | 25.78% | 114 | 35-49 | 9.96% | 9.83% | 34 | 11.37% | 21 | 7.02% | 24 | 8.54% | 35 | 12.46% |
| NC | 281 | 24.22% | 309 | 50-64 | 24.13% | 26.64% | 73 | 24.41% | 71 | 23.75% | 67 | 23.84% | 98 | 34.88% |
| VA | 281 | 24.22% | 684 | 65+ | 62.04% | 58.97% | 180 | 60.20% | 191 | 63.88% | 183 | 65.12% | 130 | 46.26% |
| ALL | 1160 | 100.00% | 1160 | Total | 100.00% | 100.00% | 299 | 100.00% | 299 | 100.00% | 281 | 100.00% | 281 | 100.00% |
| | | | | No Answer | | | 65 | 17.86% | 75 | 20.05% | 66 | 19.02% | 84 | 23.01% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 82.14% | Valid % | 79.95% | Valid % | 80.98% | Valid % | 76.99% |

| | | | Q15. | HISPANIC | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DC | 298 | 25.80% | | | | | | | | | | | | |
| FL | 300 | 25.97% | 63 | Hispanic | 5.35% | 5.45% | 13 | 4.36% | 19 | 6.33% | 11 | 3.94% | 20 | 7.19% |
| NC | 279 | 24.16% | 1092 | Not Hispanic | 94.65% | 94.55% | 285 | 95.64% | 281 | 93.67% | 268 | 96.06% | 258 | 92.81% |
| VA | 278 | 24.07% | 1155 | Total | 100.00% | 100.00% | 298 | 100.00% | 300 | 100.00% | 279 | 100.00% | 278 | 100.00% |
| ALL | 1155 | 100.00% | | No Answer | | | 66 | 18.13% | 74 | 19.79% | 68 | 19.60% | 87 | 23.84% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 81.87% | Valid % | 80.21% | Valid % | 80.40% | Valid % | 76.16% |

**Q16.**

| Region | Count | % | Count | ETHNICITY/RACE | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DC | 296 | 25.83% | 737 | White | 69.13% | 64.31% | 117 | 39.53% | 237 | 80.07% | 196 | 70.50% | 187 | 67.75% |
| FL | 296 | 25.83% | 278 | Black/African American | 18.94% | 24.26% | 146 | 49.32% | 27 | 9.12% | 59 | 21.22% | 46 | 16.67% |
| NC | 278 | 24.26% | 21 | Asian | 1.18% | 1.83% | 4 | 1.35% | 3 | 1.01% | 1 | 0.36% | 13 | 4.71% |
| VA | 276 | 24.08% | 110 | Two or more races | 9.80% | 9.60% | 29 | 9.80% | 29 | 9.80% | 22 | 7.91% | 30 | 10.87% |
| ALL | 1146 | 100.00% | 1146 | Total | 100.00% | 100.00% | 296 | 100.00% | 296 | 100.00% | 278 | 100.00% | 276 | 100.00% |
| | | | | No Answer | | | 68 | 18.68% | 78 | 20.86% | 69 | 19.88% | 89 | 24.38% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 81.32% | Valid % | 79.14% | Valid % | 80.12% | Valid % | 75.62% |

**Q17.**

| Region | Count | % | Count | EDUCATION | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 40 | No high school diploma | 3.37% | 3.48% | 11 | 3.70% | 9 | 3.03% | 13 | 4.69% | 7 | 2.53% |
| | | | 200 | High school graduate or equivalent | 18.86% | 17.42% | 49 | 16.50% | 63 | 21.21% | 59 | 21.30% | 29 | 10.47% |
| DC | 297 | 25.87% | 232 | Some college, no degree | 19.49% | 20.21% | 49 | 16.50% | 75 | 25.25% | 59 | 21.30% | 49 | 17.69% |
| FL | 297 | 25.87% | 119 | Associate's or technical certificate | 10.47% | 10.37% | 19 | 6.40% | 42 | 14.14% | 39 | 14.08% | 19 | 6.86% |
| NC | 277 | 24.13% | 243 | Bachelor's degree | 18.69% | 21.17% | 51 | 17.17% | 51 | 17.17% | 56 | 20.22% | 85 | 30.69% |
| VA | 277 | 24.13% | 314 | Graduate or professional degree | 25.48% | 27.35% | 118 | 39.73% | 57 | 19.19% | 51 | 18.41% | 88 | 31.77% |
| ALL | 1148 | 100.00% | 1148 | Total | 100.00% | 100.00% | 297 | 100.00% | 297 | 100.00% | 277 | 100.00% | 277 | 100.00% |
| | | | | No Answer | | | 67 | 18.41% | 77 | 20.59% | 70 | 20.17% | 88 | 24.11% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 81.59% | Valid % | 79.41% | Valid % | 79.83% | Valid % | 75.89% |

**Q18.**

| Region | Count | % | Count | PARTY | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 336 | Republican | 32.91% | 29.32% | 17 | 5.80% | 136 | 45.95% | 88 | 31.88% | 93 | 33.94% |
| DC | 293 | 25.72% | 467 | Democrat | 35.09% | 41.00% | 197 | 67.24% | 77 | 26.01% | 98 | 35.51% | 95 | 34.67% |
| FL | 296 | 25.99% | 254 | Independent | 23.56% | 22.30% | 51 | 17.41% | 66 | 22.30% | 69 | 25.00% | 68 | 24.82% |
| NC | 276 | 24.23% | 24 | Another party | 2.14% | 2.11% | 4 | 1.37% | 2 | 0.68% | 10 | 3.62% | 8 | 2.92% |
| VA | 274 | 24.06% | 60 | Unsure | 4.53% | 5.27% | 24 | 8.19% | 15 | 5.07% | 11 | 3.99% | 10 | 3.65% |
| ALL | 1139 | 100.00% | 1139 | Total | 100.00% | 100.00% | 293 | 100.00% | 296 | 100.00% | 276 | 100.00% | 274 | 100.00% |
| | | | | No Answer | | | 71 | 19.51% | 78 | 20.86% | 71 | 20.46% | 91 | 24.93% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 80.49% | Valid % | 79.14% | Valid % | 79.54% | Valid % | 75.07% |

**Q19.**

| Region | Count | % | Count | REG VOTE OR DL | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DC | 296 | 26.06% | | | | | | | | | | | | |
| FL | 294 | 25.88% | 1107 | Yes | 97.62% | 97.45% | 285 | 96.28% | 289 | 98.30% | 267 | 98.16% | 266 | 97.08% |
| NC | 272 | 23.94% | 19 | No | 1.28% | 1.67% | 10 | 3.38% | 2 | 0.68% | 3 | 1.10% | 4 | 1.46% |
| VA | 274 | 24.12% | 10 | Unsure | 0.88% | 0.88% | 1 | 0.34% | 3 | 1.02% | 2 | 0.74% | 4 | 1.46% |
| ALL | 1136 | 100.00% | 1136 | Total | 100.00% | 100.00% | 296 | 100.00% | 294 | 100.00% | 272 | 100.00% | 274 | 100.00% |
| | | | | No Answer | | | 68 | 18.68% | 80 | 21.39% | 75 | 21.61% | 91 | 24.93% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 81.32% | Valid % | 78.61% | Valid % | 78.39% | Valid % | 75.07% |